# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

## NO. 24-30043

**UNITED STATES OF AMERICA,**
**Plaintiff-Appellee,**

**vs.**

**GEORGE PETERSON,**
**Defendant-Appellant**

## APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA
## CASE # 22-231 DIVISION "A"
## HONORABLE JAY C. ZAINEY, DISTRICT JUDGE PRESIDING

## <u>BRIEF FOR THE DEFENDANT-APPELLANT GEORGE PETERSON</u>

 s/ Richard J. Richthofen, Jr.
**RICHTHOFEN & ASSOCIATES, LLC**
Richard J. Richthofen, Jr. (LEAD COUNSEL)
3900 Canal Street
New Orleans, LA 70119
Office: (504) 899-7949
Facsimile: (504) 899-2518
Email: rick@rjrlawfirm.com

i

# CERTIFICATE OF INTERESTED PERSONS

*United States vs. George Peterson*
No. 24-30043

In compliance with Fifth Circuit Local Rule 28.2.1, undersigned counsel for Appellant certifies that they know of no persons, associations of persons, firms, partnerships, or corporations which have an interest in the outcome of this case other than the parties noted in the style of the case.

## STATEMENT REGARDING ORAL ARGUMENT

Appellant respectfully requests oral argument on the issues raised below in his case.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS..................................................ii

STATEMENT REGARDING ORAL ARGUMENT........................................iii

TABLE OF CONTENTS...................................................................iv

TABLE OF AUTHORITIES...............................................................v

STATEMENT OF JURISDICTION....................................................vii

STATEMENT OF ISSUES................................................................viii

STATEMENT OF THE CASE.............................................................9

     (i)     Course of Proceedings and Disposition in the Court Below..........9

     (ii)    Statement of Facts....................................................... 10

SUMMARY OF ARGUMENT...........................................................12

ARGUMENT................................................................................13

CONCLUSION.............................................................................29

CERTIFICATE OF SERVICE..........................................................30

CERTIFICATE OF COMPLIANCE.................................................31

# TABLE OF AUTHORITIES

CASES:                                                                    PAGES:

*Cf Minneapolis Star & Tribune Co.* v. *Minn. Comm 'r of Revenue,*
460 U.S. 575, 578, 585-92 (1983) ……………………………………..…… 22

*United States v. Chester,* 628 F.3d 673 at 683 (4th Cir. 2010)……..……..…..24

*Ezell v. City of Chicago,* 651 F.3d 684 at 704 (7th Cir. 2011)..……….…..…. 5, 21

*Haynes v. United States,* 760 Fed. Appx. 324 (5th Cir. 2019)……..…..…..…15, 25

*District of Columbia v. Heller,* 554 U.S 570 at 624-25 (2008) ...14, 17, 18, 21, 22,
…………………………………………………………………………..24

*Illinois v. Gates,* 462 U.S. 213, 230-33 (1983) ………………………..…… 29

*Innovator Enters., Inc.* v. *Jones,* 28 F. Supp. 3d 14, 18 n.1 (D.D.C. 2014) …... 16

*Jackson v. City & County of San Francisco,* 746 F.3d 953 at 967 (9th Cir.
2014)………………………………………………………………… 21

*Kolbe v. Hogan,* 849 F.3d 114 at 133 (4th Cir. 2017) ………....……17, 20, 21, 24

*McCullen v. Coakley,* 573 U.S. 464, 486 (2014) ………..…………….………. 24

*McDonald v. City of Chicago,* 561 U.S. 742  at 780 (2010) ……….…..5, 17, 22

*Murphy v. Guerrero,* 2016 WL 5508998 (D.N.M.I. Sept. 28, 2016) …...……... 22

*Packingham v. North Carolina,* 137 S. Ct. 1730, 1736 (2017) …………...…24, 26

*U.S. v. Byrd,* 31 F.3d 1329, 1340, (5th Cir. 1994) ……………………………… 28

*United States v. Masciandaro,* 638 F.3d 458, 470 (4th Cir. 2011) …………….. 19

v

*United States v. Miller,* 307 U.S. 174, 182 (1939) ……………..………19, 23, 24, 29

*U.S.* v. *Peden,* 891 F.2d 514, 518 (5ᵗʰ Cir. 1989) ……………………………… 28

*United States v Perez*, 484 F.3d 735 (5ᵗʰ Cir. 2007) …………………………… 26

*United States v. Pruess,* 703 F.3d 242, 247 (4th Cir. 2012) …………………... 25

+

## <u>STATUTES AND RULES:</u>

Fifth Circuit Local Rule 28.2.1 …………………………………………… iv

18 U.S.C. § 3231 …………………………………………………………… viii

28 U.S.C. § 1291 …………………………………………………………… viii

Title 26, United States Code, Sections 5841, 5861(d) and 5871 ………..……… 10

Federal Rules of Criminal Proc. Rule 119(a)(2) ……………………………….. 10

U.S.C. Second Amendment …………………………..………… 12, 13, 15-23, 25

26 U.S.C. § 5841(a) ………………………………………………………… 15

26 U.S.C. § 5841(b) ………………………………………………………… 15

26 U.S.C. § 5845G  ………………………………………………………… 16

18 U.S.C. § 921(a)(3)(c), (24) ………………………………………...……….. 16

78 Congressional Record 11400 (daily ed. June 13, 1934) ……………………. 26

# STATEMENT OF JURISDICTION

(A) The district court had jurisdiction of this criminal proceeding under 18 U.S.C. § 3231.

(B) As notice of appeal is timely, this Court has jurisdiction under 28 U.S.C. § 1291.

(C) Judgment was entered January 9, 2024, and Defendant was sentenced on January 9, 2024. Defendant's counsel filed a *Notice of Intent to Appeal* on January 18, 2016.

(D) This appeal is from a final judgment in a criminal proceeding.

# STATEMENT OF THE ISSUES

I. **THE DISTRICT COURT COMMITTED REVERSIBLE ERROR WHEN IT OVERRULED DEFENDANT'S MOTION TO DISMISS THE INDICTMENT.**

II. **THE DISTRICT COURT COMMITTED REVERSABLE ERROR WHEN IT OVERRULED DEFENDANT'S MOTION TO SUPPRESS.**

## STATEMENT OF THE CASE

### (i)    Course of Proceedings and Disposition in the Court Below

On October 20, 2022, the defendant, George Peterson was indicted by a grand jury and charged with one count setting forth a violation of Title 26, United States Code, Sections 5841, 5861(d) and 5871, alleging that on or about June 29, 2022, in the Eastern District of Louisiana, the defendant, George Peterson, knowingly received a firearm, to wit: a black cylinder which is a firearm silencer and firearm muffler, not registered to him in the National Firearms Registration and Transfer Record. (ROA 1).

Thereafter on July 10, 2024, the defendant, George Peterson filed a Motion to Dismiss Count I of the Indictment (ROA 42) and a Motion to Suppress (ROA 43).

On August 21, 2024, the Trial court rendered its Order and Reasons denying the Defendant's Motion to Dismiss Indictment and Motion to Suppress (ROA 48). On August 29, 2024, the defendant was rearraigned (ROA 48) and entered a conditional plea pursuant to Rule 119(a)(2) of the Federal Rules of Criminal Procedure, reserving the right to have the United States Court of Appeals for the Fifth Circuit review the district court's denial of his motions to dismiss the

indictment and to suppress evidence (ROA 50). On January 9, 2024, the district court entered its judgment as to the Defendant, George Peterson, and he was sentenced accordingly (ROA 67). On January 18, 2024, the defendant filed his Notice of Appeal (ROA 69).

(ii)                           **Statement of Facts**

On June 29, 2022, both federal and state law enforcement officers executed warrants on Mr. Peterson at his home at 233 Modem Farms Road, Waggaman, Louisiana. This was also the location of his business, PDW Gun Solutions, LLC, (hereinafter "PDW") a federally licensed FFL business. Jefferson Parish Sheriff's Office (JPSO) deputies executed a search warrant as well as an arrest warrant on Mr. Peterson relative to delinquent parish sales tax issues. A Federal Task Force, including ATF agents, Louisiana State Police officers, New Orleans Police Department officers, JPSO officers and at least one representative of the United States Attorney's Office for the Eastern District of Louisiana, totaling over 50 Law Enforcement Officers, executed a search warrant and participated in this "raid" on Mr. Peterson's home and business.

The JPSO Search and Arrest Warrant was based on non-payment of delinquent parish sales taxes. Mr. Peterson acknowledges receipt of delinquent

parish sales tax notices which were presented to his accountant/bookkeeper for further handling. He denies any criminal intent in this non-payment issue.

The federal search warrant was based upon issues with Mr. Peterson's operation of PDW, specifically: alleged straw purchases; improper record keeping on the 4473 forms; failure to complete and forward multiple firearm purchase forms; and issues related to quick time to crime traces involving firearms sold by PDW. During this raid, federal agents seized the entire inventory of PDW, totaling over 300 firearms, including Mr. Peterson's personal firearms, firearms held by PDW for repair, and firearms awaiting delivery/transfer. In total, over $400,000.00 (retail value) of inventory was seized from Mr. Peterson and PDW. Also seized were PDW records, including the 4473 forms, receipts, copies of client's driver licenses, the "A & D" book, (acquisitions and dispositions), both business and personal computers, Mr. Peterson's two minor children's electronics, an external hard drive containing personal family information including family photos, two DVRs and video from them. Although not anticipated in the search, during this search the unlicensed suppressor was found in a safe and promptly seized. No other charges were levied against Mr. Peterson save the unlicensed suppressor charge.

Mr. Peterson's argument is that he purchased a "solvent trap" and a kit to

convert this solvent trap into a suppressor. He had forgotten about the homemade suppressor until agents discovered it in a safe in his bedroom. There was no intent to secrete or hide his possession of this suppressor from the government in any form or fashion and no scheme to defraud the government out of the $200.00 tax levied in registering a suppressor. This was simply an oversight on Mr. Peterson's part as he was unsure if the conversion would render an operable suppressor or not, and he did not want to register an inoperable solvent trap and simply forgot to do the paperwork after the conversion.

## SUMMARY OF ARGUMENT

The district court erred when it denied the Motion to Dismiss filed by the defendant. The Motion to Dismiss was filed on the basis the defendant was charged with knowingly received and possessed a firearm and as such, the defendant is entitled to the privileges and rights accorded by the Second Amendment and the National Firearms Act (NFA) requiring registration and the payment of a tax on the device possessed by the defendant is an unconstitutional infringement on those rights. Additionally, the district court erred when it dismissed the motion to suppress evidence filed by the defendant without conducting an evidentiary hearing based on the evidence and arguments presented in the defendant's motion.

# ARGUMENT

## I.

## THE DISTRICT COURT COMMITTED REVERSIBLEERROR WHEN IT OVERRULED DEFENDANT'S MOTION TO DISMISS THE INDICTMENT.

The Court of Appeal reviews *De Novo* the denial of a motion to dismiss an indictment when such motion was brought on the basis that the statute was unconstitutional as it applied to the defendant.

The Defendant's Motion to Dismiss must be considered in the context that the indictment charged him with "knowingly received and possessed **a firearm"** (emphasis supplied).

Paradoxically, the government now argues that the device for which the defendant received and possessed is not a firearm to deny the constitutional rights of the defendant as provided for by the Second Amendment.

The Second Amendment "extends, *prima facie,* to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller,* 554 U.S. at 582. It excludes, however, weapons that are "not typically possessed by law-abiding citizens for lawful purposes." *Id.* at 625. Under this rubric, silencers are entitled to Second Amendment protection because they (1) qualify as "arms" that are (2) most frequently possessed by law-abiding citizens for lawful purposes.

The National Firearms Act (NFA) sets out "an interrelated statutory system for the taxation of certain classes of firearms." *Haynes* v. *United States,* 390 U.S. 85, 87 (1968). Relevant here, the NFA and its implementing regulations impose two requirements on any "manufacturer, importer, or maker" of firearms. First, manufacturers must "identify" every firearm by "plac[ing] on the frame or receiver thereof an individual serial number," as well as "certain additional information" (e.g., the model of the firearm and its "caliber or gauge"). 27 C.F.R. § 479.102(a)( 1),(2)(i)-(ii).

Second, the NFA instructs the secretary of the treasury to "maintain a central registry of all firearms in the United States which are not in the possession or under the control of the United States," known as the National Firearms Registration and Transfer Record (NFRTR) 26 U.S.C. § 584l(a). Any firearm manufacturer is required to "register each firearm he manufactures, imports, or makes" in the NFRTR. *Id.* § 5841(b). To register a firearm, a manufacturer must file a notice "set[ting] forth the name and address of the manufacturer, . . . the date of manufacture, the type, model, length of barrel, overall length, caliber, gauge or size, serial numbers, and other marks of identification." 27 C.F.R.§ 479.103; *see also* 26 U.S.C. § 5841(a).

Once a firearm is registered m the NFRTR, it "shall not be transferred"

until its current possessor has filed, and the secretary has approved, an application "for the transfer and registration of the firearm" in the name of the transferee. *Id.* § 5812(a), (b). The new registration is then recorded in the NFRTR. *See 21* C.F.R. § 479.I0I(b). The NFA defines a transfer to include "selling, assigning, pledging, leasing, loaning, giving away, or otherwise disposing of." 26 U.S.C. § 5845G. In addition to completing the registration paperwork, the transferor must pay a $200 tax for every firearm he wishes to transfer. *Id.* § 581 l(a), (b).

The NFA makes it "unlawful for any person . . . to receive or possess a firearm" that "is not registered to him in the National Firearms Registration and Transfer Record," or "is not identified by a serial number." *Id.* § 5861(d), (i). Under the NFA, a firearm includes "any firearm muffler or firearm silencer, which is defined as "any device for silencing, muffling, or diminishing the report of a portable firearm." *Id.* § 5845(a)(7); 18 U.S.C. § 92l(a)(3)(C), (24). "In this context, the word 'report' refers to the sound of a gunshot." *Innovator Enters., Inc.* v. *Jones,* 28 F. Supp. 3d 14, 18 n.1 (D.D.C. 2014).

The Second Amendment provides that "[a] well-regulated militia, being necessary to the security of a free state, the right of the people to keep and bear arms, shall not be infringed." U.S. Const. Amend. IL In (2008), the Supreme Court held the Second Amendment codified a pre-existing individual right to keep and

15

bear arms. 554 U.S. at 595. The "central holding" of *Heller*, the Court later explained, was that "the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home." *McDonald v. City of Chicago,* 561 U.S. 742, 780 (2010); *see also Kolbe* v. *Hogan,* 849 F.3d 114, 131 (4th Cir. 2017) (*en bane) ["Kolbe II]* ("The Second Amendment's 'core protection,' the *Heller* Court announced, is 'the right of law-abiding, responsible citizens to use arms in defense of hearth and home.'" (quoting *Heller,* 554 U.S. at 634-35)).

Following *Heller,* the Appellate Courts have employed a two-step inquiry to determine whether a statute violates the Second Amendment. First, a court must determine "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." *Kolbe II,* 849 F.3d at 133. If the answer is no, "the challenged law is valid." *United States v. Chester,* 628 F.3d 673, 680 (4th Cir. 2010). If the answer is yes, the court must "apply an appropriate form of means-end scrutiny," i.e., "select between strict scrutiny and intermediate scrutiny." *Kolbe II,* 849 F.3d at 133. The level of scrutiny "depends on the nature of the conduct being regulated and the degree to which the challenged law burdens the [Second Amendment] right." *Id.* at 133.

The District Court erred when it failed to conclude that (1) silencers are

"arms" for Second Amendment purposes and referred to as a firearm in the indictment, and (2) the NFA's silencer-registration requirement burdens lawful gun owners' Second Amendment rights. The government's argument is unable to bear its burden of showing the NFA satisfies the appropriate level of means-end scrutiny.

Silencers receive the *explicit* protection of the Second Amendment because they constitute "arms" (or accessories to arms). And even if they did not, silencers would still fall within the scope of the Second Amendment's *implicit* guarantee because their use is indispensable to exercise of the core second Amendment right, i.e., the use of a gun for self- defense in the home. *Heller* defined "arms" to include "weapons of offence, or armor of defense", or "anything that a man wears for his defense, or takes into his hands, or used in with to cast at or strike another." *Id* at 581. To "bear arms," in sum, means to "wear, bear, or cany ... for the purpose ... of being armed and ready for offensive or defensive action in case of conflict with another person." *Id.* at 584 (ellipses in original).

Inasmuch as a bullet must pass through an attached silencer to arrive at its intended target, silencers are "used" for an offensive purpose to the same degree as a firearm itself. *Id.* Silencers are an integral part of a firearm, used to "cast .. or strike" a bullet at another person. *Id.* Consequently, silencers are "[ w]eapons of offense" deserving of Second Amendment protection. *See id.* at 582; *cf* 26 U.S.C.

17

§ 5845(a)(7) (defining "firearm," for NFA purposes, to include firearm silencers); 18 U.S.C. § 92l(a)(3) (defining "firearm," for purposes of Gun Control Act of 1968, to include firearm silencers).

Even if silencers do not quality as protected "arms" in and of themselves, they are nevertheless eligible for protection as a modem-day analog to the various firearm accessories historically considered to be arms. The Fourth Circuit has held that "historical meaning enjoys a privileged interpretative role in the Second Amendment context." *United States v. Masciandaro,* 638 F.3d 458, 470 (4th Cir. 2011). That history indicates that "arms," for Second Amendment purposes, include not just a firearm itself, but also the "proper accoutrements" that render that firearm useful and functional. *United States v. Miller,* 307 U.S. 174, 182 (1939). In *Miller,* the Supreme Court surveyed founding-era state laws and explained that many required militia members to carry - in addition to a "musket" or "rifle" - such items as "ammunition," "one pound of powder," "twenty bullets," a box "contain[ing] not less than twenty-four cartridges," a "proper quantity of powder and ball," and "one pound of good powder, and four pounds of lead, including twenty blind cartridges." *Id.* at 180-82. Indeed, at the time the Second Amendment was adopted, "[t]he possession of arms also implied the possession of ammunition." *Id.* at 180.

In recognition of the historically broad scope of protected "arms," and given

18

that silencers are "necessary to use ... weapons effectively," this Court should conclude that silencers are "arms" within the scope of the Second Amendment's explicit guarantees *Kolbe I,* 813 F.3d at 174.

The Second Amendment, like all enumerated constitutional provisions, contains both explicit and implicit guarantees. *See Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 579 (1980) ("[T]he Court has acknowledged that certain unarticulated rights are implicit in enumerated guarantees.").[13] If an unarticulated right is "indispensable to the enjoyment of [a] right[] explicitly defined," it will "share constitutional protection in common with [the] explicit guarantee]." *Id.* Several circuits have applied this principle to Second Amendment claims. In *Ezell,* for instance, the plaintiffs challenged a Chicago ordinance that prohibited private citizens from using shooting ranges within city limits. 651 F.3d at 691-92. Applying the same two-step framework the Fourth Circuit does, the Seventh Circuit began by asking whether range training is categorically unprotected by the Second Amendment." *Id.* at 704. The court concluded it was not since the ability to own a gun for self-defense in the home would be worthless if an owner lacked the concomitant ability to practice using it: "The right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use; the core right wouldn't mean much without the training and practice that make it

effective." *Id.* Likewise, the Ninth Circuit held in *Jackson* that an ordinance banning the sale - but not possession-of hollow-point bullets infringed a gun owner's Second Amendment rights because "the right to possess firearms for protection implies a corresponding right to obtain the bullets necessary to use them." 746 F.3d at 967. If a gun owner is unable to purchase the bullets she needs to practice self-defense in the home, it is irrelevant that she may possess the gun she would use to do so. A prohibition on selling ammunition therefore falls within "the historical understanding of the scope of the Second Amendment right." *Id.* at 968.

The same logic applies here. As explained above, using silencers improves accuracy, reduces disorientation after firing, and helps prevent substantial and irreversible damage to users' health. If, as *Heller* holds, the Second Amendment protects the right to use a gun for self-defense in the home, it must also protect the "corresponding right" to do so without incurring serious health risks. *Ezell,* 651 F.3d at 704; *Jackson,* 746 F.3d at 967. Regulation of the use of silencers therefore "imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." *Kolbe II,* 847 F.3d at 133. In accordance "with the historical understanding of the scope of the right," the Second Amendment protects those arms that are (1) commonly possessed by law-abiding citizens (2) for lawful purposes. *Heller,* 554 U.S. at 624-25; *Chester,* 628 F.3d at 676. Silencers satisfy

20

both requirements. The use of silencers fits comfortably within the Second Amendment right "to keep and bear arms for lawful purposes." *McDonald,* 561 U.S. at 780.

Both the NFA requirements at issue in this case-that silencer be registered and that they bear a serial number-impose a burden on the right of law-abiding citizens to possess silencers for lawful purposes. Because neither requirement is narrowly tailored to achieve a significant government interest, they do not pass intermediate scrutiny. In *Murphy v. Guerrero,* 2016 WL 5508998 (D.N.M.I. Sept. 28, 2016), the court considered a statute that prohibited law-abiding citizens from possessing guns unless they held a valid weapon identification card (WIC). 2016 WL 550 998, at *6. The statute permitted the Department of Public Safety to issue WICs no fewer than 15, and no more than 60, days after receipt of an application. *Id.* The statute therefore "completely prevent[ed] a law-abiding citizen from using a firearm in exercise of his or her right to self-defense - at least while their first WIC application [wa]s pending." *Id.* at *8. Although the Second Amendment deprivation persisted only for "a limited time," the court recognized that "[ c]ompletely preventing an individual from exercising his right to keep and bear arms" nevertheless "represent[ed] a serious imposition." *Id.*

The deprivation effected by the NFA is much more substantial than in

*Murphy.* Rather than two weeks or two months, applicants for an NFA registration must wait an average of eight months before they can obtain the silencers they have a constitutional right to possess. They must also pay a purchase price that has been artificially inflated by the NFA's mandatory $200.00 tax on silencer transfers. *Cf Minneapolis Star & Tribune Co.* v. *Minn. Comm 'r of Revenue,* 460 U.S. 575, 578, 585-92 (1983) (holding Minnesota infringed First Amendment freedom of the press when it imposed a "use tax on the cost of paper and ink products consumed in the production of a publication").

The Supreme Court's opinion in *Miller* suggests that regulations of this kind, though not amounting to a permanent or categorical prohibition, impose a cognizable burden on the Second Amendment right to bear arms. In *Miller,* the Supreme Court considered whether requiring the registration of a short-barreled shotgun under the NFA was consistent with the Second Amendment 307 U.S. at 178. Based on "the absence of any evidence" that such a weapon was "ordinary military equipment" or had "some reasonable relationship to the preservation or efficiency of a well-regulated militia," the Court held it could not "say that the Second Amendment guarantees the right to keep and bear such an instrument." *Id.* The *Heller* Court deduced from this holding that the Second Amendment confers an individual, rather than merely a collective, right to bear arms: "[h]ad the *[Miller]*

Court believed that the Second Amendment protects only those serving in the militia, it would have been odd to examine the character of the weapon rather than simply note that the two crooks were not militiamen" 554 U.S. at 622. The NFA's registration requirement burdens the Second Amendment right to possess silencers for lawful purposes.

If a statute burdens Second Amendment conduct, courts apply an appropriate form of means-end scrutiny" - either intermediate or strict scrutiny. *Kolbe v. Hogan,* 849 F.3d at 133. The "level of scrutiny [courts] a p p l y depends on the nature of the conduct being regulated and the degree to which the challenged law burdens the [Second Amendment] right." *Id.* Where a law "severely burden[s] the core protection of the Second Amendment, i.e., the right of law-abiding, responsible citizens to use arms for self-defense in the home," strict scrutiny is required. *Id.* at 138. For statutes that impose a less severe burden, intermediate scrutiny is appropriate. *Id.*

Even assuming intermediate scrutiny applies to the NFA, the statute does not pass constitutional muster. To "survive intermediate scrutiny, a law must be narrowly tailored to serve a significant governmental interest." *Packingham v. North Carolina,* 137 S. Ct. 1730, 1736 (2017). The law "need not be the least restrictive or least intrusive means of serving the government's interests."

*McCullen v. Coakley,* 573 U.S. 464, 486 (2014). "But the government still may not regulate [protected conduct] in such a manner that a substantial portion of the burden on [such conduct] does not serve to advance its goals." *Id.; see also Packingham,* 137 S. Ct. at 1736 (explaining that in First Amendment context, a statute fails intermediate scrutiny if it "burden[s] substantially more speech than is necessary to further the government's legitimate interests"). "[I]ntermediate scrutiny places the burden of establishing the required fit squarely upon the government." *Chester,* 628 F.3d at 683. Intermediate scrutiny, if it "burden[s] substantially more speech than is necessary to further the government's legitimate interests"). "[I]ntermediate scrutiny places the burden of establishing the required fit squarely upon the government." *Chester,* 628 F.3d at 683.

If the registration requirement is permissible, therefore, it must advance some more targeted purpose. In general, the Supreme Court has said the NFA was designed to "'make it more difficult for the gangster element'" of the 1930s "'to obtain certain types of weapons.'" *Haynes,* 390 U.S. at 87 n.4 (quoting H.R. Rep. No. 914, 86th Cong., 1st Sess., 2 (1959)). But the only "certain types of weapons" referenced in legislative history are high-powered firearms. *See, e.g.,* 78 Cong. Rec. 11400 (daily ed. June 13, 1934) (statement of Congressman Connery) ("[T]he primary purpose of the bill is to stop gangsters from getting hold of

24

machine guns."); H.R. Rep. No. 1780, 73d Cong., 2d Sess., 1 (1934) ("[W]hile there is justification for permitting the citizen to keep a pistol or revolver for his own protection without any restriction, there is no reason why anyone except a law officer should have a ... sawed-off shotgun.") is required. *Id.* at 138. For statutes that impose a less severe burden, intermediate scrutiny is appropriate. *Id.* The government's interest in regulating silencers is particularly insubstantial given the infrequency with which they are used in crime. Despite the presence of roughly 1.5 million registered silencers in the United States - to say nothing of any unregistered silencers - they are exceedingly rare instruments of criminal activity. Pistols, which the NFA does not require to be registered, are used to commit an exponentially larger number of crimes each year.

A prohibition on firearm possession by convicted felons is presumptively lawful under the Second Amendment. *United States v. Pruess,* 703 F.3d 242, 247 (4th Cir. 2012). But that fact is irrelevant to considering Mr. Peterson's as - applied challenge to the silencer-registration requirement. Mr. Peterson has not previously been convicted of a felony, and the application of the NFA to his silencers therefore cannot be justified on the theory that the registration scheme serves the important public purpose of keeping firearms out of the hands of convicted felons. A requirement that all silencer possessors - including otherwise lawful owners like Mr.

25

Hasson - undergo the registration process is not "narrowly tailored" to any government interest. *Packingham,* 137 S. Ct. at 1736. of convicted felons. A requirement that all silencer possessors, including otherwise lawful owners like Mr. Peterson undergo the registration process is not "narrowly tailored" to any government interest. *Packingham,* 137 S. Ct. at 17.

## II.

## THE DISTRICT COURT COMMITTED REVERSIBLE ERROR WHEN IT DENIED THE DEFENDANT'S MOTION TO SUPPRESS

When reviewing the denial of a motion to suppress evidence, the court of appeals reviews the district court's factual findings for clear error and the district court's conclusions regarding the sufficiency of the warrant and the constitutionality of law enforcement action *de novo. United States v Perez*, 484 F.3d 735 (5th Cir. 2007).

The Appellant submits that the affidavit in support of the subject warrant application failed to establish probable cause that a crime involving the seized firearms was committed, involving, or having a relationship with the premises to be searched under the subject warrant. Therefore, such warrant is in violation of the Fourth Amendment of the United States Constitution.

The base allegation of the affidavit providing support for the search

warrant was based on stale information. It asserted that on June 1, 2018, that it authorized a letter to ATF that was materially false. There is nothing in the affidavit to show that the information given by Peterson was false when given, and there is nothing in the affidavit to support any search of the ATF records to show that the letter of June 1, 2018, had not been supplemented by new and more current information. As such, this information was stale and could not provide a reasonable basis for probable cause in June 2022 some four years distant.

The allegation on page six of the affidavit that Peterson facilitated a "straw purchase" contradicts the factual statement made by Peterson and what was reported by the unnamed agents and CI. Any allegations of the CI should be disregarded as there is no statement in the affidavit that the particular CI had given reliable information in the past. Often a CI's veracity is assessed from the accuracy of previous information supplied. As stated above no such allegation is made, and the CI's and the reliance on the CI's veracity is left unexplained. The facts alleged on page seven in the first paragraph show that Peterson refused to engage in a "straw purchase" rather than the conclusory statement of the affidavit that Peterson facilitated a "straw purchase".

The allegations in paragraph VI of the affidavit starting on page eight are

totally conclusory and lack the factual support necessary to support a search warrant. The statements in the affidavit are obviously based on hearsay evidence given by persons whose reliability cannot be tested and statements that are misleading. It is obvious that once the firearm was legally sold to the purchaser, Peterson had no control over what the purchaser does with the firearm or who the original purchaser may later sell the firearm to in a private transaction. At best, the affidavit of Agent Jared B. Miller provided probable cause for Peterson's failure to comply with the requirements to file a multiple sales report on two occasions and not probable cause for the seizure of Peterson's inventory of firearms.

In determining whether probable cause exists to order a search, the reviewing judicial authority must make a practical, common-sense decision as to whether, given all the circumstances set forth in the affidavit, there is a fair probability that contraband or evidence of a crime will be found in a particular place. *U.S. v. Byrd,* 31 F.3d 1329, 1340, (5th Cir. 1994); *U.S.* v. *Peden,* 891 F.2d 514, 518 (5th Cir. 1989). Similarly, in determining when an informant's tip and corroborating circumstances provide the probable cause necessary to secure a warrant, the issuing magistrate is to make a practical, common-sense decision; whether, given all the circumstances set forth in the affidavit, including the veracity and basis of

knowledge of the confidential informant supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. *Illinois v. Gates,* 462 U.S. 213, 230-33 (1983). A search warrant is validly issued if the totality of circumstances shows the affidavit in support of the warrant provides sufficient indicia of reliability for the information from confidential sources. *Id.*

A review of the affidavit in support of the search of the Peterson residence and business, the subject of this Motion to Suppress, will reveal the affidavit was conclusory, overly broad and showed no basis for believing that the informant's tip was trustworthy.

## CONCLUSION

For the reasons set forth above, the order of the district court's Dismissal of the Defendant's Motion to Dismiss the Indictment should be reversed, and the indictment and prosecution of the defendant George Peterson dismissed accordingly. Alternatively, the order of the district court dismissing the defendant's Motion to Suppress without conducting an evidentiary hearing, should be reversed and the matter remanded to the district court to conduct an evidentiary hearing on the defendant's Motion to Suppress.

Respectfully submitted this 2nd day of May 2024.

**RICHTHOFEN & ASSOCIATES, LLC**
*/s/* Richard J. Richthofen, Jr.
Richard J. Richthofen, Jr.
(LEAD COUNSEL)
3900 Canal Street
New Orleans, LA 70119
Office: (504) 899-7949
Facsimile: (504) 899-2518
Email: rick@rjrlawfirm.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a photocopy and an electronic copy of the foregoing brief has been served on Kevin G. Boitmann, Assistant United States Attorney, 650 Poydras Street, Suite 1600, New Orleans, Louisiana 70130, via electronic mail or ECF filing, and a photocopy on George Peterson, 233 Modern Farms Road, Waggaman, Louisiana 70094, by placing same in the United States Mail, postage prepaid, this 2nd day of May, 2024.

/s/ Richard J. Richthofen, Jr.
Richard J. Richthofen, Jr.

# CERTIFICATE OF COMPLIANCE

Pursuant to 5th Circuit Local Rule 32.2.7(c), the undersigned certifies this brief complies with the type volume limitations of Fed. R. App. P. 32 (a)(7).

1.    EXCLUSIVE OF THE EXEMPTED PORTIONS IN 5TH CIR. RULE 32.2, THE BRIEF CONTAINS (select one):

    A. _____ pages; OR

    B. 5,619 words; OR

    C. _____ lines of text in monospaced typeface.

2.    THE BRIEF HAS BEEN PREPARED (select one):

    A. In proportionally spaced typeface using:

        Software Name and Version: Word 23

        Typeface Name and Font Size: Times New Roman 14 pt.; OR

    B. In monospaced (nonproportionally spaced) typeface using:
        Typeface name and number of characters per inch: __ _

3.    THE UNDERSIGNED UNDERSTANDS A MATERIAL MISREPRESENTATION IN COMPLETING THIS CERTIFICATE, OPR CIRCUMVENTION OF THE TYPE-VOLUME LIMITS IN Fed. R. App. P. 32(a)(7) MAY RESULT IN THE COURT'S STRIKING THE BRIEF AND IMPOSING SANCTIONS AGAINST THE PERSON SIGNING THE BRIEF.

/s/ Richard J. Richthofen, Jr.
Richard J. Richthofen, Jr.