*United States v. Peterson* – No. 24-30043
Letter Brief of Defendant-Appellant George Peterson

**VIA ELECTRONIC FILING**

Lyle W. Cayce
Clerk of the Court
United States Court of Appeals
for the Fifth Circuit
600 S. Maestri Place
New Orleans, LA 70130-3408

June 12, 2025

      Re:  *United States v. Peterson* – No. 24-30043

Dear Mr. Cayce,

  The Government's letter brief only underscores why this Court should rehear this case en banc, as the Government now admits that suppressors are protected by the plain text of the Second Amendment. And while the Government argues that application of the National Firearms Act's ("NFA's") taxation-and-registration scheme to suppressors nonetheless is consistent with the Second Amendment, its arguments lack merit.

**I. The Government's Letter Brief Bolsters the Case for Granting En Banc Rehearing**

  The Government's letter brief confirms that this Court should take this case en banc. The panel in this case held that restrictions on firearm suppressors do not implicate the plain text of the Second Amendment. The Government now disagrees with that holding: "In the view of the United States, the Second Amendment protects

1

firearm accessories and components such as suppressors." Gov'ts Suppl. Resp. to Def's. Petition for Rehearing En Banc, Doc. 135 at 1 (May 29, 2025) ("Gov't Br."). The full Court now has an opportunity to correct the panel's error and bring the Court's precedent in line with the proper understanding of the Constitution on this vitally important question. The Government suggests that the panel could pretermit en banc rehearing by following the Government's lead in finding suppressors protected by the Second Amendment, but it does not explain why the panel would change its position simply because the Government has. And while Mr. Peterson would welcome such a change, the question is important enough to warrant the full Court's attention.

What is more, while the Government now properly recognizes that the NFA's taxation-and-registration scheme for suppressors implicates the Second Amendment, it seeks to salvage its conviction of Mr. Peterson by arguing that the scheme is consistent with this Nation's historical tradition of firearm regulation. Like the question whether suppressors are protected by the Second Amendment, the question whether protected arms may be subjected to taxation and registration is a vitally important one deserving the attention of the en banc Court. And it is one the Government is wrong about. The citizens of this Nation cannot be made to pay a tax that singles out the "exercise of … a high constitutional privilege." *Follett v. Town of McCormick, S.C.*, 321 U.S. 573, 578 (1944). And this Nation has no historical

tradition of mandated registration of personal firearms. "Registration requirements . . . do not meaningfully serve the purpose of ensuring that owners know how to operate guns safely in the way certain licensing requirements can," and they therefore "are often seen as half-a-loaf measures aimed at deterring gun ownership." *Heller v. District of Columbia*, 670 F.3d 1244, 1291 (D.C. Cir. 2011) (Kavanaugh, J., dissenting). The Supreme Court accordingly has suggested that the "National Firearms Act's restrictions … might be unconstitutional" when applied to protected arms. *District of Columbia v. Heller*, 554 U.S. 570, 624 (2008). This Court should take the opportunity to answer this question definitively, and it should answer it in Mr. Peterson's favor.

## II. The Government's Arguments in Favor of the Constitutionality of the NFA Lack Merit

The Government, for its part, argues that the NFA's "registration and taxation requirement is constitutional because it imposes a modest burden on a firearm accessory that is consistent with this Nation's historical tradition because suppressors are specially adaptable to criminal misuse." Gov't Br. at 2. But this argument fails at multiple levels. The NFA's burdens are not modest; the government's burden is not reduced because the object of regulation is a component part of a firearm rather than a complete firearm; and whether an item is (in the Government's estimation) specially adaptable to criminal misuse is irrelevant to the constitutional analysis.

### A. The NFA's Purportedly Modest Burden Cannot Justify its Application to Suppressors

While the Government claims that the NFA imposes only a modest burden, that fact cannot justify applying the NFA's restrictions to suppressors. The Government concedes that this case implicates the plain text of the Second Amendment, and it therefore follows that the challenged law is unconstitutional unless the Government can demonstrate that it "is consistent with the Nation's historical tradition of firearm regulation." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 24 (2022). Importantly, courts cannot "engage in independent means-end scrutiny under the guise of an analogical inquiry." *Id*. at 29 n.7. This means that to the extent the burden of a law is relevant, it is relevant only in assessing whether the Government has demonstrated that its law "appl[ies] faithfully the balance struck *by the founding generation* to modern circumstances." *Id*. (emphasis added); *see also* Joel Alicea, Bruen *Was Right*, 174 U. PA. L. REV. (forthcoming 2025) (manuscript at 25–28), https://perma.cc/C592-T8GA. And the Government fails entirely to make any such showing, as it cites no Founding-era evidence that supports subjecting protected arms to special taxes and registration requirements. In any event, the Government's assertion that the NFA's burdens are modest is incorrect.

1. First, the NFA's tax burden is neither factually nor legally modest. It certainly was not modest when the NFA was adopted. In 1934, as today, the tax was $200. And $200 in 1934 was equivalent to *over $4800* today. *See CPI Inflation*

4

*Calculator*, U.S. BUREAU OF LABOR STAT., https://perma.cc/6YBY-EDSB. The tax plainly was prohibitive when enacted—a point the Government has acknowledged. *See National Firearms Act*, ATF, https://perma.cc/UZ5A-GQZ5 ("The $200 making and transfer taxes on most NFA firearms were considered quite severe and adequate to carry out Congress' purpose to discourage or eliminate transactions in these firearms."). And while inflation has reduced the burden of the tax somewhat, the Government states that suppressors can cost as little as $350, Gov't Br. at 9, which means that the NFA tax can amount to as much as 57% of the price of a suppressor.

In any event, regardless of how costly the tax is, exposure of the Second Amendment to the tax power itself is a heavy burden on Second Amendment rights. The Boston Tea Party demonstrates that the Founders of this Nation took taxation seriously. For as Chief Justice Marshall famously put it, "the power to tax involves the power to destroy." *M'Culloch v. State*, 17 U.S. 316, 431 (1819). Illustrating this principle, in successfully defending an early attack on the NFA's occupational tax on dealers from the argument that its prohibitive effect meant it was not a valid exercise of the tax power, the Government itself argued that "a tax laid upon a proper subject is not to be condemned because of its amount." Brief for the United States, 1937 WL 40682, at *8, *Sonzinsky v. United States* (U.S.). To be clear, *Sonzinsky* does not address whether suppressors are a proper subject of taxation; the Court

5

limited its decision to the dealer tax, *Sonzinsky v United States*, 300 U.S. 506, 512 (1937), and the case was about Congressional power, not the Second Amendment.

For these reasons, exposure of a constitutional right to taxation is a serious imposition, regardless of amount. In the First Amendment context the Supreme Court accordingly has said that the relevant burden is the mere "threat of burdensome taxes" that is "implicit in singling out the press" for special taxation, *Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 585 & n.7 (1983), not whether taxes have reached an abusive level. Indeed, in *Minneapolis Star & Tribune* the evidence indicated that the newspaper's tax burden would have been *lower* had it been subjected to the state's generally applicable sales tax instead of being singled out for special taxation. *See id.* at 597–98 (Rehnquist, J., dissenting). The Court nevertheless subjected the tax to the strictest constitutional scrutiny and invalidated it. Similarly, in *Harper v. Virginia State Board of Elections*, 383 U.S. 663 (1966), the Supreme Court struck down a poll tax of $1.50, reasoning that "introduc[ing] wealth or payment of a fee as a measure of a voter's qualifications" is unconstitutional regardless of "the degree of the discrimination." *Id.* at 668. And in *Boynton v. Kusper*, 494 N.E.2d 135 (Ill. 1986), the Illinois Supreme Court invalidated a tax on marriage licenses that was "only $10." *Id*. at 369. "[O]nce we acknowledge the State's power to specially tax the issuance of marriage licenses,"

the court reasoned, "a significant interference with the fundamental right to marry has been established." *Id*. at 370. The same reasoning applies here.

The Government points to dicta in *Bruen* suggesting that shall-issue carry licensing may be constitutional if applicants are not charged "exorbitant fees." *Bruen*, 597 U.S. at 38 n.9. But the Government offers no judicially administrable standards for judging when a tax on an arm would be exorbitant. Presumably, it would agree that the nearly-$5000-in-today's-money-tax the NFA initially imposed was exorbitant. Indeed, the Government itself in defending the NFA's application to short-barreled shotguns admitted that "it may be assumed that Congress … intended … to discourage, except for military and law-enforcement purposes, the traffic in and utilization of the weapons to which the Act refers." Brief for the United States, No. 696, 1939 WL 48353, at *7, *United States v. Miller* (U.S Mar. 29, 1939). So, the Government's position must be that at some point in the last ninety years the tax crossed the line from exorbitant to reasonable. But when exactly did that happen, and how can we tell? The Government does not say. The same issue is not presented by licensing fees, even if *Bruen*'s dicta were to apply. As the Supreme Court has explained in the parade-licensing context, such fees may be valid only if they are "*not* a revenue tax" but rather if they are imposed "to meet the expense incident to the administration of the act and to the maintenance of public order in the matter licensed." *Cox. v. State of New Hampshire*, 312 U.S. 569, 577 (1941) (emphasis

added). Thus, in the Second Amendment context, courts have applied *Cox* to assess whether a licensing fee is "designed to defray (and does not exceed) the administrative costs of the licensing scheme." *Kwong v. Bloomberg*, 723 F.3d 160, 166 (2d Cir. 2013). This is a judicially manageable inquiry subject to objective evaluation. Whether the Government has set a tax at too high a rate is not.

2. Second, the NFA's registration requirement is not a modest burden. There can be little doubt that had King George III sought to require the colonists to register all of their firearms with the crown, it would have "provoked polemical reactions by Americans invoking their rights as Englishmen to keep arms." *See Heller*, 554 U.S. at 594. While the Supreme Court has posited that licensing regimes may be "designed to ensure only that those bearing arms in the jurisdiction are, in fact law-abiding, responsible citizens," *Bruen*, 597 U.S. at 38 n.9 (internal quotation marks omitted), registration is wholly unnecessary for that purpose. Indeed, even if the NFA were held unconstitutional as applied to suppressors, commercial suppressor sales would still be subject to the background check requirements of the Gun Control Act. *See* 18 U.S.C. §§ 921(a)(3), 922(t). What registration does do is allow a government to track who has arms and, therefore, registration can facilitate efforts by a government to disarm the populace. It thus is unsurprising that registration requirements "are often seen as half-a-loaf measures aimed at deterring gun ownership." *Heller*, 670 F.3d at 1291 (Kavanaugh, J., dissenting).

3. Third, the penalties for violating the NFA are severe, and the severity of the penalty is a relevant consideration when engaging in analogical, historical reasoning. In *Heller*, for example, the Supreme Court distinguished historical regulations that were punished "with a small fine and forfeiture of the weapon" from the District of Columbia's handgun ban, which exposed offenders to "significant criminal penalties." 554 U.S. at 633.

Like a violation of the District of Columbia handgun ban, violation of the NFA exposes a person to significant criminal penalties, including up to ten years in prison, up to a $10,000 fine, or both. *See* 26 U.S.C. § 5871. And that is not all. A collateral consequence of a conviction is presumptive disarmament for life. *See* 18 U.S.C. § 922(g)(1). Mr. Peterson has first-hand experience of these consequences, as he was sentenced to two years in prison for possessing a suppressor in a safe in his home. *See United States v. Peterson*, 127 F.4th 941, 944–45 (5th Cir. 2025).

### B. It is Irrelevant Under *Bruen*'s Historical Analysis Whether a Suppressor is Properly Considered an "Accessory."

While a seeming logical corollary of the Government's position is that it would be constitutional to tax and require the registration of all firearms in the Nation, the Government apparently recognizes that such a result would be untenable. It therefore in a footnote seeks to distinguish suppressors from firearms on the grounds that "a law regulating or taxing the firearm itself would impose a more severe burden on the right to keep and bear arms than regulations on useful but non-

essential accessories such as suppressors." Gov't Br. at 8 n.9. But this purported distinction fails. For components of a firearm like suppressors that "facilitate armed self-defense," *Bruen*, 597 U.S. at 28, it makes no sense to draw lines between arbitrary categories such as accessory/non-accessory or essential/non-essential. *See Duncan v. Bonta*, 133 F.4th 852, 916–919 (9th Cir. 2025) (VanDyke, J., dissenting) (citing U.S. Court of Appeals for the Ninth Circuit, *Dissent video in 23-55805 Duncan v. Bonta*, YOUTUBE (Mar. 20, 2025), https://perma.cc/4LVE-5NPT). The Government admits the use of a suppressor "helps shooters avoid permanent hearing damage and facilitates communication with others when engaging in both civilian self-defense and public defense," that "[s]uppressors appear to improve accuracy," and that "suppressors aid in target shooting … by reducing noise pollution and providing additional hearing protection beyond personal protective equipment." Gov't Br. at 4. It should make no difference to the analysis whether the object of regulation is suppressed *firearms* or suppressors themselves. The end result is the same—use of suppressed firearms is restricted. The Government offers no logical or historical basis for treating the situations differently.

### C. There Is No Historical Basis for Reducing Constitutional Protection for Arms that in the Government's Estimation are Especially Adapted to Criminal Misuse.

In the same footnote in which it advances its baseless theory that this case is different than a case addressing a general firearm taxation-and-registration scheme

because suppressors purportedly are accessories, the Government posits an additional distinction: "Because ordinary firearms, unlike suppressors, are not peculiarly susceptible of criminal misuse, registration laws or taxes targeting such firearms likely would not serve or be proportionate to any legitimate public-safety purpose." *Id.* at 8 n.9. But this alleged distinction is no more persuasive than the other, for several reasons.

1. First, after *Bruen*, whether a firearm regulation would "serve or be proportionate to any legitimate public-safety purpose" is irrelevant. Such interest-balancing has no place in the constitutional analysis. *See Bruen*, 597 U.S. at 29 n.7. The Second Amendment provides that the right it protects "shall not be infringed," and *Bruen* confirmed that this "unqualified command" means what it says. *Id.* at 24 (citation omitted). If a person's conduct implicates the plain text of the Second Amendment, and if the Government cannot prove that its regulation of that conduct is consistent with this Nation's history of firearm regulation, the Government's regulation is unconstitutional—period. It does not matter how proportionate the regulation may be to any legitimate public-safety purpose.

2. Second, there is no historical tradition of regulating types of arms simply because they are, in the Government's estimation, "peculiarly susceptible of criminal misuse." Gov't Br. at 8 n.9. In support of this proposition, the Government cites a law review article collecting laws in which "19th-century legislatures taxed

weapons such as dueling pistols, sword canes, Bowie knives, Arkansas toothpicks, and dirks." *Id.* at 6–7 (citing David B. Kopel & Joseph G.S. Greenlee, *The History of Bans on Types of Arms Before 1900*, 50 J. LEGIS. 223, 293–328 (2024)). But there are several problems with these purported analogs.

For one, they are late-breaking (with the earliest in 1838), geographically concentrated (all in the South), and not widespread (with a total of seven states adopting tax laws by the end of the 19th century). *See* Kopel & Greenlee, *supra*, at 332, 337–38, 363. And not all of the laws cited in the article singled out firearms for special taxation. For example, the authors discuss an Alabama property tax law that taxed firearms at levels similar to "other common household goods." *Id*. at 302. That law therefore is not an analogue for a law that singles out arms for special taxation. All in all, these are hardly the "well-established and representative historical analogue[s]" that *Bruen* requires for establishing a historical tradition of firearm regulation. 597 U.S. at 30 (emphasis omitted). Indeed, the authors themselves do not claim otherwise. Instead, they conclude that "[p]unitive taxation of some arms existed in three southeastern states, but these laws *did not* create a national tradition." Kopel & Greenlee, *supra*, at 386 (emphasis added).

For another, it is apparent that laws singling out weapons such as Bowie knives, sword canes, and Arkansas toothpicks were premised on the notion that they were dangerous and unusual weapons, the regulation of which *Heller* posited is

12

"fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.' " 554 U.S. at 627 (citation omitted); *see, e.g., Aymette v. State*, 21 Tenn. 154, 159 (1840) (affirming conviction for concealed carry of a Bowie knife because the government has "a right to prohibit the wearing or keeping of weapons dangerous to the peace and safety of the citizens, and which are *not usual* in civilized warfare, or would not contribute to the common defense." (emphasis added)); *State v. Workman*, 14 S.E. 9, 11 (W.V. 1891) ("[I]n regard to the kind of arms referred to in the amendment, it must be held to refer … not to pistols, bowie-knife, brass knuckles, billies, and other such weapons as are … *only* habitually carried by bullies, blackguards, and desperadoes." (emphasis added)). *Heller* and *Bruen* criticized *Aymette* and *Workman* for having too *narrow* a conception of the right to keep and bear arms by focusing too much on the militia purpose of the right. *See Heller*, 554 U.S. at 613; *Bruen*, 597 U.S. at 65. But they reflect that 19th Century courts asked whether arms were in common use for the purposes the courts understood the right to protect when deciding whether they were protected. *See Bianchi v. Brown*, 111 F.4th 438, 513–14 (4th Cir. 2024) (Richardson, J., dissenting) ("With possibly two outliers, every state court that considered the types of arms that could be prohibited coalesced around [the] basic principle" that "the government can prohibit particular weapons only if they are (1) particularly useful for criminal activity, *and* (2) not common for lawful purposes." (emphasis added)).

13

3. Third, the Government's peculiarly-susceptible-of-criminal-misuse test cannot distinguish suppressors from "ordinary firearms" such as handguns because the portability and concealability of handguns are features much *more* susceptible of criminal misuse than the hearing-protective but modest reduction in the sound of firing offered by suppressors. *See* Gov't Br. at 1 n.1 ("Suppressors modestly reduce the decibel level of the firearms to which they attach; they do not 'silence' them.").

As Justice Breyer explained in dissent in *Heller*, "the very attributes that make handguns particularly useful for self-defense are also what make them particularly dangerous"—attributes such as being "maneuverable" and "concealable." 554 U.S. at 711 (Breyer, J., dissenting). And the theoretical utility of these features for criminal misuse is borne out in fact, as handguns "are the overwhelmingly favorite weapon of armed criminals." *Id*. at 682. Justice Breyer elaborated on this point in painstaking detail. Examples include that "[f]rom 1993 to 1997, 81% of firearm-homicide victims were killed by handgun," *id.* at 697; "in the same period, for the 41% of firearm injuries for which the weapon type is known, 82% of them were from handguns," *id.*; and in "a 1997 survey of inmates who were armed during the crime for which they were incarcerated, 83.2% of state and 86.7% of federal inmates said that they were armed with a handgun," *id.* at 698. Compare that to the Government's presentation in this case, which consists of three isolated anecdotes of suppressors being used in violent crime, *see* Gov't Br. at 7–8, with the caveat that

the Government does *not* mean "to say that suppressors are widely used for criminal purposes," *id*. at 7. Indeed, as the Government has explained elsewhere, suppressors "are very rarely used in criminal shootings." Ronald Turk, *White Paper: Options to Reduce or Modify Firearms Regulations* at 6–7, ATF (Jan. 20, 2017), https://perma.cc/JXF5-CULT.

In light of these facts, it would make no sense to say that suppressors are particularly susceptible of criminal misuse while handguns are not. In reality, there is no particularly-susceptible-of-criminal-misuse test. Rather, as *Heller* and *Bruen* establish, all arms that are in common use for lawful purposes are protected, full stop. And applying that test, suppressors fit the bill. ATF data indicates that more than 4 million suppressors are lawfully registered to non-governmental individuals and entities. *See Suppressor Owner Study* at 7, NSSF (2025), https://perma.cc/8D85-VJPU. And the Government concedes that "their beneficial use is *overwhelming* in relation to their criminal use." Gov't Br. at 7. (emphasis added).

## **CONCLUSION**

For the foregoing reasons, the Court should grant the petition for rehearing en banc and reverse the judgment below.

Dated: June 12, 2025                Sincerely,

/s/ David H. Thompson
David H. Thompson

15

Richard J. Richthofen, Jr.
3900 Canal Street
New Orleans, Louisiana 70119
Office: (504) 899-7949
Facsimile: (504) 899-2518
Email: rick@rjrlawfirm.com

Cody J. Wisniewski
FPC ACTION FOUNDATION
Suite 320
5550 Painted Mirage Road
Las Vegas, Nevada 89149
Telephone: (615) 955-4306
Facsimile: (615) 334-0463
cwi@fpcafhq.org

Peter A. Patterson
William V. Bergstrom
Athanasia O. Livas
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C., 20036
Telephone: (202) 220-9600
Facsimile: (202) 220-9601
dthompson@cooperkirk.com
ppatterson@cooperkirk.com
wbergstrom@cooperkirk.com
alivas@cooperkirk.com

*Counsel for Defendant-Appellant George Peterson*

# CERTIFICATE OF SERVICE AND COMPLIANCE

I hereby certify that I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Fifth Circuit on June 12, 2025 by using the CM/ECF system and that service was accomplished on all counsel of record by the appellate CM/ECF system.

This letter brief complies with the Court's order of May 29, 2025, because it contains no more than 15 pages excluding those parts exempted by rule. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word in Times New Roman, 14 pt. Font. The brief has been scanned and is virus-free.

Dated: June 12, 2025

/s/ David H. Thompson
David H. Thompson

*Counsel for Defendant-Appellant*
*George Peterson*