No. 24-30043

# In the
# United States Court of Appeals
# for the Fifth Circuit

◆

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

GEORGE PETERSON,

*Defendant-Appellant.*

◆

**Appeal from the United States District Court
for the Eastern District of Louisiana
Case No. 2:22-cr-231-1 (Hon. Jay C. Zainey)**

◆

**BRIEF OF THE NATIONAL RIFLE ASSOCIATION OF
AMERICA, AMERICAN SUPPRESSOR ASSOCIATION, AND
INDEPENDENCE INSTITUTE AS *AMICI CURIAE* IN SUPPORT
OF APPELLANT'S PETITION FOR REHEARING EN BANC**

◆

DAVID B. KOPEL
INDEPENDENCE INSTITUTE
727 E. 16th Ave.
Denver, CO 80203

GEORGE A. MOCSARY
UNIVERSITY OF WYOMING
COLLEGE OF LAW
1000 E. University Ave.
Laramie, WY 82071

JOSEPH G.S. GREENLEE
  *Counsel of Record*
ERIN M. ERHARDT
NATIONAL RIFLE ASSOCIATION –
INSTITUTE FOR LEGISLATIVE
ACTION
11250 Waples Mill Rd.
Fairfax, VA 22030
(703) 267-1161
jgreenlee@nrahq.org

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities, as described in the fourth sentence of Rule 28.2.1, have an interest in the outcome of this case. These representations are made in order that the Judges of this Court may evaluate possible disqualification or recusal.

1. <u>Plaintiff-Appellee</u>:
   United States of America

   <u>Counsel</u>:
   David M. Berman, Assistant U.S. Attorney
   Kevin G. Boitmann, Assistant U.S. Attorney
   Diane Hollenshead Copes, Assistant U.S. Attorney
   U.S. Attorney's Office
   Eastern District of Louisiana
   650 Poydras Street, Suite 1600
   New Orleans, LA 70130
   (504) 680-3000
   david.berman@usdoj.gov
   kevin.boitmann@usdoj.gov
   diane.copes@usdoj.gov

2. <u>Defendant-Appellant</u>:
   George Peterson

   <u>Counsel</u>
   David H. Thompson
   Peter A. Patterson
   William V. Bergstrom
   Athanasia O. Livas
   COOPER & KIRK, PLLC
   1523 New Hampshire Ave., N.W.

Washington, D.C., 20036
(202) 220-9600
dthompson@cooperkirk.com
ppatterson@cooperkirk.com
wbergstrom@cooperkirk.com
alivas@cooperkirk.com

Richard J. Richthofen, Jr.
3900 Canal Street
New Orleans, Louisiana 70119
(504) 899-7949
rick@rjrlawfirm.com

Cody J. Wisniewski
FPC Action Foundation
Suite 320
5550 Painted Mirage Road
Las Vegas, Nevada 89149
(615) 955-4306
cwi@fpcafhq.org

3. *Amici Curiae*:
National Rifle Association
American Suppressor Association
Independence Institute

Counsel:
Joseph G.S. Greenlee
Erin M. Erhardt
National Rifle Association – Institute for Legislative Action
11250 Waples Mill Rd.
Fairfax, VA 22030
(703) 267-1161
jgreenlee@nrahq.org
eerhardt@nrahq.org

David B. Kopel
Independence Institute

727 E. 16th Ave.
Denver, CO 80203
(303) 279-6536
david@i2i.org

George A. Mocsary
University of Wyoming College of Law
1000 E. University Ave.
Laramie, WY 82071
(307) 766-5262
gmocsary@uwyo.edu

*Amici* National Rifle Association of America, American Suppressor Association, and Independence Institute are nonprofit organizations. No *amici* has a parent corporation, nor is there any publicly held corporation that owns more than 10% of their stock.

/s/ *Joseph G.S. Greenlee*
Joseph G.S. Greenlee
Counsel for *Amici Curiae*

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ..........................................i

TABLE OF CONTENTS ...........................................................iv

TABLE OF AUTHORITIES................................................................v

STATEMENT OF *AMICI CURIAE* ...........................................1

SUMMARY OF ARGUMENT .................................................3

ARGUMENT .......................................................................5

    I.   All firearm regulations must be justified by historical tradition..........................................................................5

    II.  Registration often leads to confiscation, and confiscation often leads to tyranny. ...............................................8

CONCLUSION ...............................................................15

CERTIFICATE OF COMPLIANCE......................................17

CERTIFICATE OF SERVICE.............................................18

# TABLE OF AUTHORITIES

## Cases

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) ....................................................................... 5, 6, 10

*Heller v. District of Columbia,*
    670 F.3d 1244 (D.C. Cir. 2011) ......................................................... 7, 8

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen,*
    597 U.S. 1 (2002) ................................................................. 5, 6, 7, 15

*Nunn v. State,*
    1 Ga. 243 (1846) ................................................................................ 9

*United States v. Rahimi,*
    602 U.S. 680 (2024) ............................................................................ 7

## Constitutional Provisions

U.S. Const. amend. II ............................................................... 5, 7, 15

## Statutes and Regulations

14 Car. 2. c. 3, §13 .............................................................................. 9

18 U.S.C. §923(g)(1)(A) ....................................................................... 15

18 U.S.C. §926(a)(3) ........................................................................... 14

55 Stat. 742 ....................................................................................... 14

N.Y.C. Administrative Code, Ch. 3 §10-303.1 (Supp. 1992) ................... 13

N.Y.C. Administrative Code, Ch. 3 §10-305 (Supp. 1992) ...................... 13

Pub. L. No. 99-308 ............................................................................. 15

## Other Authorities

Halbrook, Stephen P., GUN CONTROL IN THE THIRD REICH: DISARMING
THE JEWS AND "ENEMIES OF THE STATE" (2013) .................................... 11

Halbrook, Stephen P., *Why Can't We Be Like France? How the
Right to Bear Arms Got Left Out of the Declaration of Rights and
How Gun Registration Was Decreed Just in Time for the Nazi
Occupation*, 39 FORDHAM URB. L.J. 1637 (2012) ................................ 12

Hardy, David T., *Armed Citizens, Citizen Armies: Toward a
Jurisprudence of the Second Amendment*, 9 HARV. J. L. & PUB.
POL'Y 559 (1986) ..................................................................................... 10

Johnson, Nicholas J., et al., FIREARMS LAW AND THE SECOND
AMENDMENT: REGULATION, RIGHTS AND POLICY (3d ed.
2022) ..................................................................................... 10, 11, 13

JOURNAL OFFICIEL DE LA RÉPUBLIQUE FRANÇAISE, Oct. 24, 1935 ........... 11

Kopel, David B., *We Should Be More Skeptical About Gun Control*,
*in* GUNS: CONCEAL AND CARRY (Anne Cunningham ed., 2018) ........... 14

Malcolm, Joyce Lee, TO KEEP AND BEAR ARMS: THE ORIGINS OF AN
ANGLO-AMERICAN RIGHT (1994) ............................................................. 9

*Rept. No. 1120 [to accompany S. 1579]*, HOUSE COMMITTEE ON
MILITARY AFFAIRS, 77th Cong., 1st Sess. (Aug. 4, 1941) ..................... 14

*The "Night of Broken Glass,"* HOLOCAUST ENCYCLOPEDIA ...................... 11

*The Nazi Deadline*, AMERICAN RIFLEMAN, Feb. 1942 ............................. 12

## STATEMENT OF *AMICI CURIAE*[1]

The **National Rifle Association of America (NRA)** is America's oldest civil rights organization and foremost defender of Second Amendment rights. It was founded in 1871 by Union veterans—a general and a colonel—who, based on their Civil War experiences, sought to promote firearms marksmanship and expertise amongst the citizenry. Today, the NRA is America's leading provider of firearms marksmanship and safety training for both civilians and law enforcement. The NRA has approximately four million members, and its programs reach millions more.

The **American Suppressor Association (ASA)** is a 501(c)(6) nonprofit dedicated to the advancement of pro-suppressor reform nationwide. Founded in 2011, ASA has lobbied for suppressor rights in dozens of states, was instrumental in the legalization of suppressors in Iowa, Minnesota, Vermont, and Guam, and helped legalize the use of suppressors for hunting in 19 states. It also played a pivotal role in the

---

[1] No counsel for a party authored this brief in any part. No party or counsel contributed money intended to fund its preparation or submission. Only *amici* and its members contributed money intended to fund its preparation or submission.

1

elimination of the transfer tax on suppressors, short-barreled firearms, and NFA-defined "any other weapons" as part of the One Big Beautiful Bill Act.

Founded in 1985 on the eternal truths of the Declaration of Independence, the **Independence Institute** is a 501(c)(3) public policy research organization based in Denver, Colorado. The briefs and scholarship of Research Director David Kopel have been cited in seven Supreme Court opinions, including *Bruen*, *McDonald* (under the name of lead amicus Int'l Law Enforcement Educators & Trainers Association (ILEETA)), and *Heller* (same). Kopel has also been cited in over one hundred thirty opinions of lower courts as well. The Institute's Senior Fellow in Constitutional Studies, law professor Robert Natelson, has been cited in a dozen Supreme Court opinions.

## SUMMARY OF ARGUMENT

The panel's decision sets a perilous precedent. By upholding registration requirements for suppressors while assuming they are protected arms, the logical extension of the decision is that the government may require the registration of all arms—and without needing to satisfy the Supreme Court's test for Second Amendment challenges.

The Supreme Court has repeatedly stated that its text-and-history test applies to *all* firearm regulations. The panel, however, made a series of errors that led it to the conclusion that the Supreme Court's test does not apply to firearm registration laws. First, the panel concluded that regulations the Supreme Court has recognized as "presumptively lawful" are spared from the Court's test. Next, the panel determined that shall-issue carry licensing laws are "presumptively lawful." Then, the court equated laws requiring the registration of individual arms with shall-issue carry licensing laws, despite the regulations serving distinct purposes and being applied through different means. The result is that registration schemes are shielded from Second Amendment scrutiny.

3

Registration schemes raise serious constitutional concerns. History is replete with examples of firearm registration lists being used to confiscate weapons, and examples of confiscation leading to tyranny. Englishmen under King Charles II, Jews in the Weimar Republic, and citizens of the Third French Republic are only a few examples of people who suffered the consequences of firearm registration lists in the wrong hands. To shield such regulations from Second Amendment scrutiny, as the panel did, is perilous and contrary to the Supreme Court's mandate that all firearm regulations be justified with historical regulations.

The Court should grant the petition for rehearing en banc to rectify the injustice in this case and the troubling precedent it sets.

# ARGUMENT

## I.  All firearm regulations must be justified by historical tradition.

The Supreme Court has repeatedly stated that its text-and-history test applies to *all* firearm regulations—even those it has deemed "presumptively lawful." *See District of Columbia v. Heller*, 554 U.S. 570, 626–27, n.26 (2008).

In *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, the Supreme Court set forth "*the standard* for applying the Second Amendment": "When the Second Amendment's plain text covers" the regulated conduct, "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." 597 U.S. 1, 24 (2022) (emphasis added). "*Only then*," the Court declared, "may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Id.* (quotation omitted and emphasis added). *Bruen* twice reiterated that the "*only*" way the government can justify a modern regulation is with historical tradition. *Id.* at 17 ("*Only if* a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command.")

5

(quotation marks omitted and emphasis added); *id.* at 34 ("*Only if* respondents carry that burden can they show that the pre-existing right codified in the Second Amendment … does not protect petitioners' proposed course of conduct.") (emphasis added).

The *Bruen* Court specifically applied its text-and-history test when considering a regulation deemed "presumptively lawful" in *Heller*. New York "attempt[ed] to characterize [its] proper-cause requirement as a 'sensitive-place' law." *Bruen*, 597 U.S. at 30. Regardless of any presumption, the Court consulted "the historical record" to conclude that "there is no historical basis for New York to effectively declare the island of Manhattan a 'sensitive place.'" *Id.* at 30–31. *Bruen* thus held the "presumptively lawful" "sensitive place" regulation to the same standard that applies to all firearm regulations.

*Bruen*'s treatment of the "sensitive place" regulation is consistent with *Heller*, which conveyed that "presumptively lawful" regulations must still be historically justified. The *Heller* Court acknowledged that it did "not provid[e] extensive historical justification for those regulations," but promised that "there will be time enough to expound upon the *historical justifications*" in future cases. 554 U.S. at 635 (emphasis added).

The Court has clearly and repeatedly defined its Second Amendment test. *See Bruen*, 597 U.S. at 17, 24; *United States v. Rahimi*, 602 U.S. 680, 692 (2024) ("the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition"). The Court has never articulated an exception for the "presumptively lawful" regulations.

The panel, however, concluded that the challenged registration requirement "is a shall-issue licensing regime," *see* Panel Op. at 11; that shall-issue licensing regimes are presumptively lawful, *id.*; and therefore, the registration requirement is not subject to "*the standard* for applying the Second Amendment" established by the Supreme Court, *Bruen*, 597 U.S. at 24 (emphasis added); *see also* Panel Op. at 10–12.

Even if *Bruen* is read as treating shall-issue licensing regimes as "presumptively lawful," *see* 597 U.S. at 38 n.9; *id.* at 80 (Kavanaugh, J., concurring) ("shall-issue licensing regimes are constitutionally permissible"); and even if "presumptively lawful" regulations are granted special treatment, it is "important to distinguish registration laws from licensing laws," *Heller v. District of Columbia*, 670 F.3d 1244, 1291 (D.C. Cir. 2011) ("*Heller II*") (Kavanaugh, J., dissenting). "Licensing

7

requirements mandate that gun owners meet certain standards" and can be intended to "advance gun safety by ensuring that owners understand how to handle guns safely, particularly before guns are carried in public." *Id.* "Registration requirements, by contrast, require registration of individual guns and do not meaningfully serve the purpose of ensuring that owners know how to operate guns safely"—they are rather "seen as half-a-loaf measures aimed at deterring gun ownership." *Id.* Because licensing and registration requirements serve distinct purposes and operate differently, it is inappropriate "[t]o rely on [licensing] laws to support registration requirements." *Id.* at 1294.

## II.    Registration often leads to confiscation, and confiscation often leads to tyranny.

Assuming "that suppressors constitute 'arms' under the Second Amendment," Panel Op. at 11, the panel concluded that the challenged registration requirement is constitutional, *id.* at 14–15. This sets a troubling precedent—the logical extension is that the government may require the registration of any and all firearms.

History is replete with examples of firearm registration lists being used to confiscate weapons, and examples of confiscation leading to tyranny. This brief highlights only a few to comply with the word limit.

*Stuart Restoration*. As the Georgia Supreme Court recognized in 1846, the right to keep and bear arms was "trampled under foot by Charles I. and his two wicked sons and successors," but then "re-established by the revolution of 1688." *Nunn v. State*, 1 Ga. 243, 251 (1846).

"A form of firearms registration had been introduced" in England in 1662, when King Charles II's Privy Council "issued an order to all gunsmiths to report to the Ordnance Office with a complete list of all the weapons they had produced in the past six months, as well as the names of the customers who had purchased them." Joyce Lee Malcolm, To Keep and Bear Arms: The Origins of an Anglo-American Right 42–43 (1994). Additionally, from that day forward, "gunsmiths were to report to the Master of the Armoury every Saturday night with a record of their manufacturers and sales for the week." *Id.* at 43.

The militia act of that same year empowered officials to "search for and seize all Armes in the custody or possession of any person" deemed "dangerous to the Peace of the Kingdome." An Act for Ordering the Forces in the Several Counties of this Kingdom, 14 Car. 2. c. 3, §13. The abuse of the above powers and lists to confiscate the arms of religious and

political opponents was a key grievance leading to the 1689 English Bill of Rights. Thus, the parliamentary debates over its arms provision— which "has long been understood to be the predecessor to our Second Amendment," *Heller*, 554 U.S. at 593—"focused largely upon the disarmament under the 1662 Militia Act." David T. Hardy, *Armed Citizens, Citizen Armies: Toward a Jurisprudence of the Second Amendment*, 9 HARV. J. L. & PUB. POL'Y 559, 582 (1986).

Notably, when the Irish were required to register their arms in 1807, opponents of the bill in Parliament argued that it violated the constitutional arms right and that the Irish should have the same rights as Englishmen. Nicholas J. Johnson, et al., FIREARMS LAW AND THE SECOND AMENDMENT: REGULATION, RIGHTS AND POLICY 2161 (3d ed. 2022).[2]

**Weimar Republic**. Violence caused by Nazi and communist gangs led to firearms registration in 1928. *Id.* at 1824. When Adolf Hitler came to power in 1933, however, the registration lists fell into the hands of the Nazi party. "Almost immediately upon seizing power, the Nazis began using the registration lists to seize guns, knives, and other arms from

---

[2] http://firearmsregulation.com/www/FRRP3d_Combined.pdf.

10

members of other political parties, especially the Social Democrats, and from Jews." *Id.* "In October 1938, arms registration lists were used to complete the disarmament of the Jews, including even knives." *Id.* Weeks later, Nazi paramilitary forces carried out *Kristallnacht*, resulting in the burning of hundreds of synagogues, the vandalization of thousands of Jewish-owned business, the death of hundreds of Jews, and the arrest and transfer of 30,000 Jewish men to concentration camps. *See The "Night of Broken Glass,"* HOLOCAUST ENCYCLOPEDIA (last visited Sep. 14, 2025).[3] Mass murder would soon follow. *See generally* Stephen P. Halbrook, GUN CONTROL IN THE THIRD REICH: DISARMING THE JEWS AND "ENEMIES OF THE STATE" (2013).

***French Third Republic***. In 1935, French Prime Minister Pierre Laval issued a decree mandating that, "Each person in possession of a firearm … must make a declaration of it to the prefect or the sub-prefect of the place of his residence." JOURNAL OFFICIEL DE LA RÉPUBLIQUE FRANÇAISE, Oct. 24, 1935, at 11203, art. 9.[4] After Germany invaded

---

[3] https://encyclopedia.ushmm.org/content/en/article/the-night-of-broken-glass.

[4] https://gallica.bnf.fr/ark:/12148/bpt6k20305517/f3.item. This decree did not apply to hunting rifles or to historical or collector's weapons.

France in 1940, the German authorities, with the assistance of French officials,[5] zealously disarmed the French population—executing many who declined to surrender their firearms. Stephen P. Halbrook, *Why Can't We Be Like France? How the Right to Bear Arms Got Left Out of the Declaration of Rights and How Gun Registration Was Decreed Just in Time for the Nazi Occupation*, 39 FORDHAM URB. L.J. 1637, 1671–88 (2012). As the NRA's publication emphasized in 1942, the registration records were instrumental to the Nazis' confiscation efforts: "What an aid and comfort to the invaders and to their Fifth Column cohorts have been the convenient registration lists of privately owned firearms—lists readily available for the copying or stealing at the Town Hall in most European cities." *The Nazi Deadline*, AMERICAN RIFLEMAN, Feb. 1942, at 7. The lack of civilian arms weakened resistance and facilitated oppressions by the Germans.

---

JOURNAL OFFICIEL DE LA RÉPUBLIQUE FRANÇAISE, Oct. 24, 1935, at 11203, art. 10.

[5] France's "most prominent collaborator would be none other than Pierre Laval, who had decreed firearm registration in 1935." Halbrook, *Why Can't We Be Like France?*, at 1673.

***Australia***. The concept of registration leading to confiscation is not solely historical. "[B]y the mid-1990s, universal gun registration was the law in most of Australia." Johnson, at 1770. In 1996, all semiautomatic and pump-action rifles and shotguns were banned and the "registered guns were surrendered at confiscation centers under pain of imprisonment." *Id.* at 1771. Then in 2003, another confiscation program resulted in the surrender of hundreds of models of registered handguns. *Id.*

***New York City***. Registration has also led to confiscation domestically. New York City required the registration of long guns in the mid-1960s. When the City enacted an "assault weapons" ban in 1991, it included a rather Orwellian provision explicitly providing for the confiscation of specified private arms from those who had previously registered them. The statute required owners to remove their arms from the city or "peaceably surrender" them to the police, while providing that the police "commissioner may authorize the use of such [surrendered] weapon[s] by the department." N.Y.C. Administrative Code, Ch. 3 §§10-303.1, 10-305 (Supp. 1992). After enactment, "police used the registration lists to conduct home inspections of individuals whose registered guns had been

outlawed." David B. Kopel, *We Should Be More Skeptical About Gun Control*, *in* GUNS: CONCEAL AND CARRY 164 (Anne Cunningham ed., 2018).

Congress has long recognized that the consequences of firearms registration can be catastrophic. In 1941, shortly before the United States entered World War II, Congress explicitly prohibited the President from "requiring the registration of any firearms [otherwise lawfully] possessed by any individual for his personal protection or sport." 55 Stat. 742. The House of Representatives' legislative committee explained that the prohibition was included in the Property Requisition Act in response to the "totalitarian and dictatorial nations" that were then "engag[ing] in the willful and wholesale destruction of personal rights and liberties," and to prevent "the constitutional right of the people to bear arms" from being "impair[ed] or infringe[d]." *Rept. No. 1120 [to accompany S. 1579]*, HOUSE COMMITTEE ON MILITARY AFFAIRS, 77th Cong., 1st Sess., at 2 (Aug. 4, 1941).[6] Currently, the Firearms Owners' Protection Act of 1986 prohibits the creation of a national gun registry. 18 U.S.C. §926(a)(3);

---

[6] https://www.govinfo.gov/content/pkg/SERIALSET-10556_00_00-208-1120-0000/pdf/SERIALSET-10556_00_00-208-1120-0000.pdf.

Pub. L. No. 99-308; 18 U.S.C. §923(g)(1)(A); *see also Heller II*, 670 F.3d at 1291 (Kavanaugh, J., dissenting) ("[R]egistration of lawfully possessed guns is not 'longstanding'" and "has not been traditionally required in the United States and, indeed, remains highly unusual today.").

Registration schemes raise serious constitutional concerns. To shield them from Second Amendment scrutiny, as the panel did, is perilous and contrary to the Supreme Court's mandate that all firearm regulations be justified with historical regulations.

## CONCLUSION

The petition for rehearing en banc should be granted to correct the panel's misapplication of Supreme Court precedent and ensure that firearm registration requirements are subject to the proper test mandated by *Bruen*.

Respectfully submitted,

/s/ *Joseph G.S. Greenlee*
JOSEPH G.S. GREENLEE
   *Counsel of Record*
ERIN M. ERHARDT
NATIONAL RIFLE ASSOCIATION –
INSTITUTE FOR LEGISLATIVE ACTION
11250 Waples Mill Rd.
Fairfax, VA 22030
(703) 267-1161
jgreenlee@nrahq.org

15

DAVID B. KOPEL
INDEPENDENCE INSTITUTE
727 E. 16th Ave.
Denver, CO 80203
(303) 279-6536
david@i2i.org

GEORGE A. MOCSARY
UNIVERSITY OF WYOMING
COLLEGE OF LAW
1000 E. University Ave.
Laramie, WY 82071
(307) 766-5262
gmocsary@uwyo.edu

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 29(b)(4) because this brief contains 2,592 words, excluding the parts of the brief excluded by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in 14-point, proportionally spaced Century Schoolbook font.

/s/ *Joseph G.S. Greenlee*
Counsel for *Amici Curiae*

17

## CERTIFICATE OF SERVICE

I certify that on September 17, 2025, I served the foregoing with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to all registered CM/ECF users.

/s/ *Joseph G.S. Greenlee*
Counsel for *Amici Curiae*