# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit
**FILED**
December 9, 2025
Lyle W. Cayce
Clerk

No. 24-30043

United States of America,

        *Plaintiff—Appellee*,

versus

George Peterson,

        *Defendant—Appellant*.

_____

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:22-CR-231-1

_____

Before Elrod, *Chief Judge*, and Higginbotham and Southwick, *Circuit Judges*.

Jennifer Walker Elrod, *Chief Judge*:

    We withdraw our prior opinion and substitute the following.

    Following a law enforcement raid on his home and place of business, George Peterson pleaded guilty to possessing an unregistered suppressor in violation of various provisions of the National Firearms Act (NFA). On appeal, he challenges the denial of two pretrial motions: a motion to dismiss his indictment on Second Amendment grounds and a motion to suppress evidence on Fourth Amendment grounds.

No. 24-30043

Assuming without deciding that the Second Amendment protects suppressors, we AFFIRM the district court's denial of Peterson's motion to dismiss because we agree with the government that the NFA's shall-issue licensing regime is presumptively constitutional under *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), and Peterson's as-applied challenge fails on this record. Furthermore, because the exclusionary rule's good-faith exception prevents suppression of the suppressor discovered at Peterson's home, we also AFFIRM the district court's denial of his motion to suppress.

I

A

In the summer of 2022, federal and state law enforcement officers executed a warrant at PDW Solutions, LLC, Peterson's firearm business that he operated out of his home. An Eastern District of Louisiana magistrate judge issued that warrant based on an affidavit submitted by a Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) officer.

According to the officer, the ATF had spent several months investigating Peterson before seeking the warrant. In one instance, the ATF sent a Jefferson Parish Sherriff's Office deputy into PDW to purchase two handguns. Peterson sold the officer the guns, but he did not report the transaction to the ATF despite 27 C.F.R. § 478.126a's requirement that he must. In another instance, an undercover ATF agent patronized PDW with a confidential informant. Even though Peterson was aware that the informant could not lawfully purchase a firearm, he nevertheless sold the agent two firearms after watching the informant hand the agent money for the purchase. Peterson failed to report this transaction as well. And because all of this occurred at Peterson's home, the ATF believed that Peterson had also violated 18 U.S.C. § 1001(a)(3) by representing, in his federal-firearms-

No. 24-30043

license application, that he would conduct business only at gun shows and out of a leased storage unit.

In light of this information, the magistrate judge issued a warrant authorizing a search of Peterson's home (where the ATF alleged he stored his inventory) and of another structure attached to his home (where it alleged he conducted business). The warrant also authorized seizure of PDW's transactional and financial records, proceeds from firearm sales, firearms themselves, and computers and other digital devices, among other things.

The ATF executed the warrant the next day. During the search, ATF agents discovered a firearm suppressor inside Peterson's bedroom-closet safe. Peterson did not purchase this suppressor from a manufacturer; he acquired materials and a kit to make it himself. The suppressor was in working condition, but it neither had a serial number nor was registered in the National Firearms Registration and Transfer Record.

B

An Eastern District of Louisiana grand jury indicted Peterson for possession of an unregistered suppressor under 26 U.S.C. §§ 5841, 5861(d), and 5871.

In response, Peterson filed a motion to dismiss the indictment and a motion to suppress the evidence obtained through the ATF's search of his property. Peterson argued: (1) that the indictment should be dismissed because the NFA's registration scheme violates the Second Amendment as applied to him; and (2) that the evidence obtained from the ATF's search of his home should be suppressed because that search violated the Fourth Amendment.

The district court denied both motions, and Peterson agreed to enter a conditional guilty plea. He reserved the right to appeal the denial of his

motion to dismiss and of his motion to suppress. Peterson elected not to challenge the NFA's registration requirement on its face.

The district court sentenced Peterson to twenty-four months of imprisonment, and he timely appealed his two preserved issues.

## II

Peterson first challenges the district court's denial of his motion to dismiss. Specifically, he argues that the NFA's suppressor-registration requirement unconstitutionally burdens his Second Amendment rights. We first provide background on suppressors and the NFA before turning to Peterson's as-applied challenge on Second Amendment grounds.

### A

A suppressor is "a device that attaches to the muzzle of a firearm and makes the firearm quieter when discharged." *Paxton v. Dettelbach*, 105 F.4th 708, 710 (5th Cir. 2024); *see also* 18 U.S.C. § 921(a)(25) ("The terms 'firearm silencer' and 'firearm muffler' mean any device for silencing, muffling, or diminishing the report of a portable firearm . . . ."). Though many use the term "silencer," that term "is a misnomer, in that—despite movie fantasies—a noise suppressor reduces decibels[] but does not actually 'silence' the discharge of a firearm. Noise may be muffled or diminished, and maybe by only a few decibels at that, but it can still be heard." Stephen P. Halbrook, *Firearm Sound Moderators: Issues of Criminalization and the Second Amendment*, 46 Cumb. L. Rev. 33, 36 (2015) [hereinafter Halbrook, *Firearm Sound Moderators*].

Suppressors function by causing the gasses emanating from a fired weapon to do so more slowly and therefore more quietly. *Id.* at 41–42. Hiram Maxim (whom TIME Magazine affectionately labeled "Dr. Shush" and "noise's bogeyman") is credited not only with inventing the suppressor but

No. 24-30043

also with using the same sort of technology to abate the noise produced by early combustion engines. *Id.* at 41, 45 & n.79.

Many commentators have recognized the benefits of suppressors. For example, while many firearms produce "noise levels of between 140–160 decibels, at which level hearing can be permanently impaired," suppressors can reduce the noise to around 135 decibels, at which level hearing loss is less likely to occur. *See* Robert J. Spitzer, *Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers*, 83 Law & Contemp. Probs. 231, 249–50 (2020). Further, hunters may use suppressors to avoid spooking game and to reduce noise pollution in the jurisdictions that permit suppressors in the field. Halbrook, *Firearm Sound Moderators*, *supra*, at 35; *see also id.* at 76–78 (collecting European laws on suppressor use for hunting). Suppressors may also reduce "noise, recoil, and muzzle rise" in self-defense scenarios, giving the shooter an advantage. *See id.* at 69.

Commentators have also noted that criminals infrequently use suppressors, despite a historical "association of the use of silencers with criminal acts." Spitzer, *supra*, at 249, 252. For example, in the ten-year period between 1995 and 2004, one researcher found "only two federal cases where a silencer was used in a murder." Stephen P. Halbrook, *The Power to Tax, the Second Amendment, and the Search for Which "'Gangster' Weapons" to Tax*, 25 Wyo. L. Rev. 149, 185 (2025) [hereinafter Halbrook, *The Power to Tax*]. Another study revealed only sixteen "serious criminal cases" between 2011 and 2017 involving the use of a suppressor. Spitzer, *supra*, at 252. Scholars debate whether the lack of association between suppressors and criminality is due to criminals' lack of interest in using suppressors, or whether the NFA has proven effective in keeping them out of the hands of criminals. *Id.* Either way, and despite the lack of correlation between suppressors and criminal activity, some oppose suppressors on the basis that they may inhibit detection of crime. *See id.* at 252–53.

No. 24-30043

At the federal level, the ATF regulates suppressors through enforcement of the NFA.[1] The NFA instructs the Attorney General to "maintain a central registry of all firearms"—known as the National Firearms Registration and Transfer Record—"in the United States which are not in the possession or under the control of the United States." 26 U.S.C. § 5841(a). The National Firearms Registration and Transfer Record contains information on each firearm, the firearm's date of registration, and the identification and address of the person entitled to possess the firearm. *Id.* § 5841(a)(1)–(3). The term *firearm* is defined to include any suppressor. *Id.* § 5845(a).

To register a firearm under the NFA, the person making the firearm must complete an application identifying the firearm and the applicant and submit it to the ATF. *Id.* § 5822. The application must contain copies of the applicant's fingerprints and his photograph. *Id.* In addition to submitting an application, the applicant must pay a $200 "tax" to register the firearm. *Id.*; *see also id.* § 5821(a). A completed application "shall be denied if the making or possession of the firearm would place the person making the firearm in violation of law." *Id.* § 5822; *accord* 27 C.F.R. § 479.65.[2]

---

[1] States also regulate suppressors. At least eight states have banned them outright, meaning that possession of a suppressor is unlawful even if a person may lawfully possess a suppressor under the NFA. Halbrook, *The Power to Tax*, *supra*, at 184; *see, e.g.*, Cal. Penal Code § 33410 ("Any person, firm, or corporation who within this state possesses a silencer is guilty of a felony . . . ."); N.Y. Penal Law § 265.02(2). Louisiana, the state in which agents recovered Peterson's unregistered suppressor, does not prohibit suppressor possession.

[2] The NFA imposes nearly identical registration requirements for applicants who wish to "transfer" a firearm. 26 U.S.C. §§ 5811–5812; 27 C.F.R. §§ 479.84–.87. The term *transfer* is defined to include "selling, assigning, pledging, leasing, loaning, giving away, or otherwise disposing of." 26 U.S.C. § 5845(j). Because Peterson made the unregistered suppressor that the ATF discovered, we focus on the "making" provisions.

No. 24-30043

If the application is approved, the individual may then make the suppressor and, if he does so, he must register it in the National Firearms Registration and Transfer Record. 26 U.S.C. § 5841(b). The individual making the firearm must also mark it with "a serial number which may not be readily removed, obliterated, or altered . . . ." *Id.* § 5842(a). If an application is denied, on the other hand, the $200 tax payment is refunded and the denial will explain the reason for disapproval. 27 C.F.R. § 479.64.

The NFA makes it unlawful for an individual to receive or possess a firearm when the firearm is not registered to him under the National Firearms Registration and Transfer Record. 26 U.S.C. § 5861(d); *see also id.* § 5871.

B

We now turn to Peterson's as-applied challenge to the NFA's suppressor-registration requirement under the Second Amendment. Peterson contends that suppressors are "Arms" protected under the Second Amendment and that the NFA is unconstitutional. The government agrees that the Second Amendment protects suppressors, but it maintains that the NFA is constitutional under *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022).

1

"We review *de novo* a district court's denial of a motion to dismiss an indictment, including any underlying constitutional claims." *United States v. Parrales-Guzman*, 922 F.3d 706, 707 (5th Cir. 2019).

The Second Amendment protects "the right of the people to keep and bear Arms." U.S. Const. amend. II. But as Justice Scalia cautioned in *District of Columbia v. Heller*, 554 U.S. 570 (2008), that right "is not unlimited." *United States v. Diaz*, 116 F.4th 458, 463 (5th Cir. 2024) (citing

*Heller*, 554 U.S. at 626), *cert. denied*, --- S. Ct. ----, 2025 WL 1727419 (2025). To identify its limits, we employ a two-step analysis. *Bruen*, 597 U.S. at 24. "We start, as always, with the text." *United States v. Giglio*, 126 F.4th 1039, 1042 (5th Cir. 2025). That is, we first consider whether "the Second Amendment's plain text covers an individual's conduct." *Bruen*, 597 U.S. at 24. If it does, "the Constitution presumptively protects that conduct," and we then turn to the second step, which compares our "Nation's historical tradition of firearm regulation" against the regulation at issue. *See id.*

In *Bruen*, the Supreme Court applied the foregoing approach when it considered the constitutionality of New York State's prohibition on possessing firearms without a license. *Id.* at 11–15. To obtain a license to carry a pistol outside of the home, New York law required an applicant to show "proper cause," meaning a demonstrated "special need for self-protection distinguishable from that of the general community." *Id.* at 12 (first quoting N.Y. Penal Law § 400.00(2)(f); and then quoting *In re Klenosky*, 428 N.Y.S.2d 256, 257 (N.Y. App. Div. 1980)). In practice, New York required evidence of threats, attacks, or other "extraordinary danger[s] to personal safety." *Id.* at 13 (quoting *In re Martinek*, 743 N.Y.S.2d 80, 81 (N.Y. App. Div. 2002)). The law vested "licensing officer[s]" with the decision to issue a license and provided limited judicial review of officers' decisions. *Id.* The Court had "little difficulty" concluding that this regime impinged on the right to bear arms in public, meaning that the law's challengers surpassed step one. *Id.* at 32–33.

Accordingly, the Court then proceeded to the second step, where it asked whether New York's licensing regime fit with our Nation's tradition of firearm regulation. The Court's detailed survey of the "Anglo-American history of public carry" revealed that historical restrictions touched on the "intent for which one could carry arms, the manner by which one carried

arms, or the exceptional circumstances under which one could not carry arms . . . ." *Id.* at 70. Historical restrictions did not, however, require law-abiding Americans to demonstrate a special need to exercise their Second Amendment rights. *Id.* As the Court explained, it knew "of no other constitutional right that an individual may exercise only after demonstrating to government officers some special need." *Id.* It therefore concluded that the New York licensing regime violated the Second Amendment, as made applicable to New York by the Fourteenth Amendment. *Id.* at 70–71.

Relevant here, the Court in *Bruen* contrasted so-called "may-issue" licensing regimes like New York's with "shall-issue" regimes that require state authorities to issue licenses "whenever applicants satisfy certain threshold requirements." *Id.* at 13. "Because these [shall-issue] licensing regimes do not require applicants to show an atypical need for armed self-defense, they do not necessarily prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right to public carry." *Id.* at 38 n.9 (quoting *Heller*, 554 U.S. at 635). Rather, "shall-issue regimes, which often require applicants to undergo a background check or pass a firearms safety course, are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Id.* (quoting *Heller*, 554 U.S. at 635). Shall-issue regimes do so by applying "narrow, objective, and definite standards" to guide licensing officials' decisions. *Id.* (quoting *Shuttlesworth v. Birmingham*, 394 U.S. 147, 151 (1969)).

Because shall-issue regimes employ objective criteria, the Court noted that nothing in its analysis of the New York may-issue law "should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes . . . ." *Id.* (citing *Drake v. Filko*, 724 F.3d 426, 442 (3d Cir. 2013) (Hardiman, J., dissenting)). Justice Kavanaugh likewise addressed the constitutionality of shall-issue regimes. *Id.* at 80 (Kavanaugh, J., concurring). He also listed some administrative conditions that shall-issue licensing

regimes may impose, like "fingerprinting, a background check, a mental health records check, and training in firearms handling and in laws regarding the use of force, among other possible requirements." *Id.* at 80.

Even so, the Court cautioned that shall-issue licensing laws are not necessarily impregnable. As it explained, shall-issue regimes remain subject to as-applied challenges where "lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry." *Id.* at 38 n.9 (majority opinion). Justice Kavanaugh expressed similar concerns in concurrence, stating that "shall-issue licensing regimes are constitutionally permissible, subject of course to an as-applied challenge if a shall-issue licensing regime does not operate in that manner in practice." *Id.* at 80 (Kavanaugh, J., concurring).

After *Bruen*, we considered a challenge to a background-check requirement and considered the following questions: "What part of *Bruen* controls our evaluation of a firearm regulation? Its imposition of an historical showing to be made by the government? Or its various assurances that it did not disturb common-place regulations in shall-issue regimes?" *McRorey v. Garland*, 99 F.4th 831, 834 (5th Cir. 2024). We answered, "the latter." *Id.*

As we explained in *McRorey*, the Supreme Court in *Heller* "described 'conditions and qualifications on the commercial sale of arms' as 'presumptively lawful.'" *Id.* at 836 (quoting *Heller*, 554 U.S. at 626–27, 627 n.26). "*Bruen* did nothing to disturb that part of *Heller*." *Id.* So, we read *Bruen* to implement a "presumption" of constitutionality for shall-issue "ancillary firearm regulations such as background checks preceding sale." *Id.* at 836–37; *see also Md. Shall Issue, Inc. v. Moore*, 116 F.4th 211, 216, 227 (4th Cir. 2024) (en banc) (concluding that a shall-issue licensing regime was "presumptively constitutional because it operates merely to ensure that

individuals seeking to exercise their Second Amendment rights are 'law-abiding' persons"), *cert. denied*, 145 S. Ct. 1049 (2025).

We then considered the *McRorey* plaintiffs' challenge to the National Instant Criminal Background Check System (NICS), under which federally licensed firearm dealers first acquire information from prospective firearm purchasers and then submit that information to NICS for a background check. *Id.* at 834. After conducting the background check, NICS provides a federal dealer one of three responses: (1) "Proceed," if the proposed purchase would not place the purchaser in violation of 18 U.S.C. § 922 or state law, (2) "Denied," if the proposed sale would place the purchaser in violation of those laws, or (3) "Delayed," if further investigation is required. *Id.* at 834–35 (citing 28 C.F.R. § 25.6(c)(1)(iv)(A)–(C)). In that way, NICS approval hinges on "narrow, objective, and definite standards" to ensure that purchasers are "law-abiding, responsible citizens." *Id.* at 837 (quoting *Bruen*, 597 U.S. at 38 n.9). NICS, therefore, was presumptively constitutional as a shall-issue condition on the purchase of arms. *Id.* at 838–39.

Turning to this case, we assume without deciding that suppressors constitute "arms" under the Second Amendment, as both parties now contend. Even so, the NFA suppressor-licensing scheme is presumptively constitutional because it is a shall-issue regime, as Peterson's counsel conceded at oral argument. Oral Argument at 4:45. His briefing before the district court and this court does not otherwise contest the "shall issue nature" of the requirement. The NFA provides that the ATF will deny a firearm-making application if the "making or possession of the firearm would place the person making the firearm in violation of law." 26 U.S.C. § 5822; *see also* 27 C.F.R. § 479.65. This is precisely the "objective[] and definite" licensing criterion held permissible under *Bruen*. 597 U.S. at 38 n.9; *see id.* at 80 (Kavanaugh, J., concurring).

Further, we have no reason to doubt on this record that the NFA's fingerprint, photograph, and background-check requirements are "designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Id.* at 38 n.9 (majority opinion) (citation omitted); *see also* 27 C.F.R. §§ 479.62–65. Peterson's failure to make any showing as to how the requirement places an unconstitutional burden on his Second Amendment rights alone is dispositive. It is not even clear he could claim that this requirement posed an unconstitutional burden as applied to him given his explanation that he failed to register because he "forgot" to do so. Finally, the NFA enforces its objective shall-issue licensing requirement through prohibiting suppressor possession by unlicensed persons, 26 U.S.C. § 5861(d), as did several of the "shall-issue" licensing regimes that *Bruen* cited approvingly. *See* 597 U.S. at 13 n.1, 38 n.9; *see also* Del. Code Ann. tit. 11, § 1442(a).

Peterson's merits brief does not address the applicability of the shall-issue presumption; in fact, it does not cite *Bruen* at all. Peterson has instead argued—both in this court and the district court—that the NFA is unconstitutional under the "two-step" means-end scrutiny that *Bruen* overruled almost two years before his appeal was lodged and more than one year before he filed his motion to dismiss.

Peterson mentions *Bruen*'s shall-issue presumption only once, in his post-oral-argument briefing, where he dismisses the presumption as "dicta." But we rejected that argument squarely in *McRorey*, a case that Peterson nowhere cites:

> [Plaintiffs] characterize passages such as footnote 9 [of the *Bruen* opinion] as *dicta*. We, however, "are generally bound by Supreme Court dicta, especially when it is recent and detailed." And it doesn't get more recent or detailed than *Bruen*.

No. 24-30043

*McRorey*, 99 F.4th at 837 (citation omitted).

These challenged provisions are therefore "presumptively lawful." *Id.* at 838–39.

2

We now turn to whether the NFA has been "put toward abusive ends" through "exorbitant fees" or "lengthy wait times in processing license applications." *Bruen*, 597 U.S. at 38 n.9. We first note that Peterson brings an as-applied challenge to the NFA. In such a challenge, we consider the facts of the defendant's "own case." *See United States v. Rahimi*, 602 U.S. 680, 693 (2024).

Here, Peterson neither alleges that he applied for an NFA license to make a suppressor, nor asserts that he paid the $200 tax, nor claims that the tax or application-processing times discouraged him from submitting an application to the ATF. Instead, he explains that he "simply forgot to do the paperwork after" he made the suppressor. The record is therefore devoid of any facts indicating that the NFA has been "put toward abusive ends" as applied to him. *See United States v. Phillips*, 645 F.3d 859, 863 (7th Cir. 2011) ("[W]hen we are presented with an as-applied challenge, we examine only the facts of the case before us and not any set of hypothetical facts under which the statute might be unconstitutional.").[3]

---

[3] For example, Peterson nowhere contends or produces evidence that a $200 tax as applied to him would "deny" him his Second Amendment rights. *See Bruen*, 597 U.S. at 38 n.9; *see also Watterson v. ATF*, No. 4:23-CV-00080, 2024 WL 897595, at *19 (E.D. Tex. Mar. 1, 2024) (rejecting challenge to NFA, in part, because "Plaintiff cannot show that a $200 tax is so exorbitant that he is effectively denied his Second Amendment right to bear arms"). We agree with Peterson that the $200 tax denied ordinary citizens the right to carry when it was initially passed in 1934; at that time, the tax was equivalent to over $4,800 in today's money. But that fact has no bearing on whether the tax is unconstitutional as applied to him today.

No. 24-30043

In addition, the record does not reveal how long applicants must wait for the ATF to process their NFA applications. Peterson cites nothing to support his claim that current processing times for NFA license approval can be upwards of eight months. When pressed on his failure to produce evidence on this claim at oral argument, Peterson's counsel acknowledged the lack of evidence, Oral Argument at 6:03, and later offered to file a supplemental letter brief with the court containing support for his claim. He has never done so, though it would have been prudent to do so given that the government at oral argument disputed his eight-month claim and asserted that current NFA processing times run only "a few days" with "returns as quickly as one day." Oral Argument at 20:40. We decline to resolve this factual dispute and decide only that Peterson's unsupported claim that applicants must wait eight months on average before they can obtain a suppressor is insufficient to overcome *Bruen*'s presumption.[4] *See Justice v. Hosemann*, 771 F.3d 285, 292 (5th Cir. 2014) (holding that "a developed factual record" with "[p]articularized facts" is "essential" to support an as-applied challenge); *Does 1-7 v. Abbott*, 945 F.3d 307, 310 n.3 (5th Cir. 2019) (reasoning that plaintiffs could not maintain an as-applied challenge because "they did not plead sufficient facts to support an as-applied challenge, and the complaint made only general allegations of unconstitutionality").

\* \* \*

In sum, *Bruen*'s presumption of constitutionality for shall-issue licensing regimes applies to the NFA's application procedures. Peterson

---

[4] We note that our court has concluded that the 10-business-day wait time for the NICS background check is permissible under *Bruen*. *McRorey*, 99 F.4th at 840; *see also Md. Shall Issue, Inc.*, 116 F.4th at 227 (upholding shall-issue law when the "record therefore reveal[ed] that, in some cases, the process for obtaining a handgun qualification license can take only a few days").

cannot overcome that presumption because the record does not reveal that the NFA has effectively "den[ied]" him his Second Amendment rights.[5] *Bruen*, 597 U.S. at 38 n.9. Accordingly, the district court did not err when it denied Peterson's motion to dismiss the indictment.

In so holding, we do not foreclose the possibility that another litigant may successfully challenge the NFA's requirements. Here, in light of the parties' agreement that suppressors are "Arms" for purposes of the Second Amendment, we decide only that Peterson has failed to "develop any argument" or record to show that the NFA is unconstitutional as applied to him. *See United States v. Bridges*, 150 F.4th 517, 531 (6th Cir. 2025) (Nalbandian, J., concurring). We need not, and therefore do not, go further. *Id.* at *9 ("If it is not necessary to decide more, it is necessary not to decide more." (alteration and citation omitted)).

---

[5] Were Peterson able to show the NFA's requirements had been "put toward[s] abusive ends" as applied to him, we would proceed to the second step of the *Bruen* analysis. *McRorey*, 99 F.4th at 839 (alteration in original) (quoting *Bruen*, 597 U.S. at 38 n.9). Under that step, the "government must 'identify a well-established and representative historical analogue'" for the NFA. *Giglio*, 126 F.4th at 1042 (quoting *Bruen*, 597 U.S. at 30). We note that some courts have concluded that the NFA's suppressor-registration requirements pass constitutional muster under *Bruen*'s second step, although we do not reach that issue here. *See, e.g.*, *United States v. Serrano*, 651 F. Supp. 3d 1192, 1211–13 (S.D. Cal. 2023) (concluding that suppressors do not fall within scope of Second Amendment but, even if they did, the NFA's registration requirements comport with this Nation's historical tradition of firearms regulation); *United States v. Lightner*, No. 8:24-CR-21, 2024 WL 2882237, at *3 (M.D. Fla. June 7, 2024) (same); *United States v. Villalobos*, No. 3:19-CR-40, 2023 WL 3044770, at *13 (D. Idaho Apr. 21, 2023) (same and explaining that "the regulation of silencers is readily analogous to the Nation's history of imposing commercial regulations on firearms"); *United States v. Beaty*, No. 6:22-CR-95, 2023 WL 9853255, at *8 n.11 (M.D. Fla. Jan. 20, 2023) ("The NFA's record-keeping and attendant payment requirements are consistent with our Nation's historical regulation of firearms."). *But see* Oliver Krawczyk, Comment, *Dangerous and Unusual: How an Expanding National Firearms Act Will Spell Its Own Demise*, 127 Dick. L. Rev. 273, 300–01 (2022).

No. 24-30043

III

Next, Peterson challenges the denial of his motion to suppress the suppressor.

The district court concluded that the good-faith exception barred application of the exclusionary rule. On appeal, though, Peterson does not mention the good-faith exception. He instead argues "that the affidavit in support of the subject warrant application failed to establish probable cause . . . in violation of the Fourth Amendment." Even if this were true, it would not go toward establishing that the good-faith exception does not apply. *See United States v. Sibley*, 448 F.3d 754, 757 (5th Cir. 2006) (enumerating the four scenarios wherein the good-faith exception does not apply). Accordingly, Peterson has likely forfeited his good-faith-exception argument. *Rollins v. Home Depot USA*, 8 F.4th 393, 397 (5th Cir. 2021).

But we need not rest our conclusion on this basis because, as we explain *infra*, we would affirm the district court's good-faith-exception decision even if Peterson's argument were preserved. That is, irrespective of whether the underlying affidavit actually gave rise to probable cause, we conclude that it was reasonable for the officers executing the warrant to rely on it. Accordingly, the exclusionary rule does not serve to bar admission of the suppressor, and the district court rightly denied Peterson's motion to suppress.

A

When considering appeals of motion-to-suppress rulings, we review "factual findings for clear error and legal conclusions *de novo*, viewing the evidence in the light most favorable to the prevailing party." *United States v. Martinez*, 102 F.4th 677, 683 (5th Cir. 2024). "The district court's determination of the reasonableness of a law enforcement officer's reliance upon a warrant issued by a magistrate [judge]—for purposes of determining

16

the applicability of the good-faith exception . . . —is also reviewed *de novo*." *United States v. Cherna*, 184 F.3d 403, 406–07 (5th Cir. 1999) (italics added).

If the good-faith exception applies, we "affirm the district court's denial of the motion to suppress." *Sibley*, 448 F.3d at 757.

B

As the district court correctly reasoned, "[t]he good-faith exception allows reliance on [a] warrant even if the search warrant is defective as long as that reliance is objectively reasonable." "Issuance of a warrant by a magistrate [judge] normally suffices to establish good faith on the part of law enforcement officers who conduct a search pursuant to the warrant." *United States v. Craig*, 861 F.2d 818, 821 (5th Cir. 1988). But the "exception does not apply when: (1) the magistrate [judge] issuing the warrant was misled by information in an affidavit that the affiant knew or should have known was false; (2) the issuing magistrate [judge] abandoned the judicial role; (3) the warrant was based on an affidavit so lacking in indicia of probable cause as to render belief in its existence entirely unreasonable; or (4) the warrant was so facially deficient that the executing officers could not have reasonably presumed it to be valid." *Sibley*, 448 F.3d at 757.

The district court rightly construed Peterson's argument as getting closest to addressing the third exception to the exception. And we agree that, despite Peterson's protests, neither it nor any of the other exceptions apply. As the government relates, the warrant described "Peterson's false representation to the ATF that he would not store or sell guns on his property; three separate law enforcement purchases from PDW; [and] PDW's failure to ever file a multiple sales report." Regardless of whether these facts would actually give rise to probable cause, they at least present "indicia of probable cause" sufficient to render belief in its existence reasonable. *See Sibley*, 448 F.3d at 757. Indeed, the affidavit at issue here

stands in stark contrast to the sorts of "bare bones" affidavits that have been deemed insufficient. *See United States v. Brown*, 941 F.2d 1300, 1303 n.1 (5th Cir. 1991) (collecting examples). Accordingly, we conclude that the officers who executed the warrant acted reasonably in relying on it. And because none of the exceptions to the good-faith exception apply, it bars application of the exclusionary rule and the district court rightly denied Peterson's motion to suppress.

## IV

For the foregoing reasons, we AFFIRM the district court's denial of Peterson's motion to dismiss and its denial of his motion to suppress.